

**ORIGINAL**

**FILED**
FEB 28 2008
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

AO 241
(Rev. 12/04)

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | District: |
|---|---|

| Name (under which you were convicted):<br><br>Jesus Valencia | Docket or Case No.: |
|---|---|

| Place of Confinement :<br>Kern Valley State Prison | Prisoner No.:<br>V-94440 |
|---|---|

| Petitioner (include the name under which you were convicted) | Respondent (authorized person having custody of petitioner) |
|---|---|
| Jesus Valencia | v. | Anthony Hedgpath |

The Attorney General of the State of California

CV 08 1144

**PETITION**

*MHP*

*(PR)*

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    Santa Clara County Superior Court
    San Jose, CA

    (b) Criminal docket or case number (if you know):  CC460324

2.  (a) Date of the judgment of conviction (if you know):  5/26/2005

    (b) Date of sentencing:  8/19/2005; **resentencing 10/5/2007**

3.  Length of sentence:  18 years

4.  In this case, were you convicted on more than one count or of more than one crime?  ☑ Yes  ☐ No

5.  Identify all crimes of which you were convicted and sentenced in this case:

    Continuous sexual abuse of a minor (Penal Code section 288.5)
    Lewd and lascivious act on minor by force (Penal Code section 288(b))
    Lewd and lascivious act on minor by force (Penal Code section 288(b))

6.  (a) What was your plea? (Check one)

    ☑ (1)   Not guilty        ☐ (3)   Nolo contendere (no contest)

    ☐ (2)   Guilty            ☐ (4)   Insanity plea

AO 241
(Rev. 12/04)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?

(c) If you went to trial, what kind of trial did you have? (Check one)

☑ Jury   ☐ Judge only

7.   Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☑ Yes   ☐ No

8.   Did you appeal from the judgment of conviction?

☑ Yes   ☐ No

9.   If you did appeal, answer the following:

(a) Name of court:   Sixth District Court of Appeal

(b) Docket or case number (if you know):   H029370

(c) Result:   Three counts affirmed; one count reversed

(d) Date of result (if you know):   12/26/2006

(e) Citation to the case (if you know):   People v. Valencia (2006) 146 Cal.App.4th 92

(f) Grounds raised:
See Attachment A

(g) Did you seek further review by a higher state court?   ☑ Yes   ☐ No

If yes, answer the following:

(1) Name of court:   California Supreme Court

(2) Docket or case number (if you know):   S149928

(3) Result:
Review Denied

(4) Date of result (if you know):   4/18/2007

AO 241
(Rev. 12/04)

(5) Citation to the case (if you know):

(6) Grounds raised:
   See Attachment A

(h) Did you file a petition for certiorari in the United States Supreme Court?    ☐ Yes    ☑ No

   If yes, answer the following:

   (1) Docket or case number (if you know):

   (2) Result:

   (3) Date of result (if you know):

   (4) Citation to the case (if you know):

10.   Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions

      concerning this judgment of conviction in any state court?    ☑ Yes    ☐ No

11.   If your answer to Question 10 was "Yes," give the following information:

      (a)    (1) Name of court:    Sixth District Court of Appeal

             (2) Docket or case number (if you know):    H030530

             (3) Date of filing (if you know):    8/15/2006

             (4) Nature of the proceeding:    Habeas Corpus

             (5) Grounds raised:
                See Attachment A

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

      ☐    Yes    ☑ No

      (7) Result:    Denied

      (8) Date of result (if you know):    12/26/2006

AO 241
(Rev. 12/04)

(b) If you filed any second petition, application, or motion, give the same information:

    (1) Name of court:

    (2) Docket or case number (if you know):

    (3) Date of filing (if you know):

    (4) Nature of the proceeding:

    (5) Grounds raised:

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    ☐   Yes   ☐  No

    (7) Result:

    (8) Date of result (if you know):

(c) If you filed any third petition, application, or motion, give the same information:

    (1) Name of court:

    (2) Docket or case number (if you know):

    (3) Date of filing (if you know):

    (4) Nature of the proceeding:

    (5) Grounds raised:

AO 241
(Rev. 12/04)

Page 6

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

❐   Yes        ❐   No

(7) Result:

(8) Date of result (if you know):

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application,

or motion?

(1)  First petition:          ☑  Yes        ❐  No

(2)  Second petition:    ❐  Yes        ❐  No

(3)  Third petition:        ❐  Yes        ❐  No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

12.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution,
       laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts
       supporting each ground.

       CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court
       remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the
       grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND ONE:**
Denial of Sixth and Fourteenth Amendment right to the effective assistance of trial counsel due to counsel's
omission to seek exclusion of the defendant's incriminating statements made to the police

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See Attachment B, pp. 22-38

(b) If you did not exhaust your state remedies on Ground One, explain why:

AO 241
(Rev. 12/04)

(c)  **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☑ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:    Habeas corpus

Name and location of the court where the motion or petition was filed:
Sixth District Court of Appeal
San Jose, CA

Docket or case number (if you know):    H030530

Date of the court's decision:    12/26/2006

Result (attach a copy of the court's opinion or order, if available):
See Attachment C

(3) Did you receive a hearing on your motion or petition?    ☐ Yes    ☑ No

(4) Did you appeal from the denial of your motion or petition?    ☑ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☑ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:
California Supreme Court
San Francisco, CA

Docket or case number (if you know):    S149931

Date of the court's decision:    4/18/2007

Result (attach a copy of the court's opinion or order, if available):
See Attachment D

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

AO 241
(Rev. 12/04)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One:

**GROUND TWO:**
Denial of Sixth and Fourteenth Amendment right to the effective assistance of trial counsel due to counsel's
failure to object to admission of Karely's testimony that she saw Laura leave defendant's room with a red stain
on her clothing and counsel's failure to request CALJIC Nos. 2.50.1 and 2.502 with regard to the evidence.
(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See Attachment B, pp. 39-49

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c)    **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?        ☑  Yes      ☐  No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why:

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑  Yes    ☐  No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:        Habeas Corpus

Name and location of the court where the motion or petition was filed:

Sixth District Court of Appeal
San Jose, CA

Docket or case number (if you know):        H030530

Date of the court's decision:        12/26/2006

AO 241
(Rev. 12/04)

Result (attach a copy of the court's opinion or order, if available):

See Attachment C

(3) Did you receive a hearing on your motion or petition?  ☐ Yes  ☑ No

(4) Did you appeal from the denial of your motion or petition?  ☑ Yes  ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  ☑ Yes  ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:
California Supreme Court
San Francisco, CA

Docket or case number (if you know):    S149931

Date of the court's decision:    4/18/2007

Result (attach a copy of the court's opinion or order, if available):

See Attachment D

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you :

have used to exhaust your state remedies on Ground Two

**GROUND THREE:**
Denial of the Sixth and Fourteenth Amendment right to the effective assistance of trial counsel due to counsel's
failure to object to admission of the evidence that defendant use drugs and fought with the police

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See Attachment B, pp. 50-53

AO 241
(Rev. 12/04)

(b) If you did not exhaust your state remedies on Ground Three, explain why?

(c)    **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☑ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:    Habeas Corpus

Name and location of the court where the motion or petition was filed:
Sixth District Court of Appeal
San Jose, CA

Docket or case number (if you know):    H030530

Date of the court's decision:    12/26/2006

Result (attach a copy of the court's opinion or order, if available):
See Attachment C

(3) Did you receive a hearing on your motion or petition?    ☐ Yes    ☑ No

(4) Did you appeal from the denial of your motion or petition?    ☑ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:
California Supreme Court
San Francisco, CA

Docket or case number (if you know):    S149931

Date of the court's decision:    4/18/2007

Result (attach a copy of the court's opinion or order, if available):
See Attachment D

AO 241
(Rev. 12/04)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you
have used to exhaust your state remedies on Ground Three:

**GROUND FOUR:**
Denial of the Sixth and Fourteenth Amendment right to the effective assistance of trial counsel due to the
cumulative prejudice flowing from counsel's three errors.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):
See Attachment B, pp. 53-54

(b) If you did not exhaust your state remedies on Ground Four, explain why:

(c)    **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☑ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d)    **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:    Habeas Corpus

AO 241
(Rev. 12/04)

Name and location of the court where the motion or petition was filed:

Sixth District Court of Appeal
San Jose, CA

Docket or case number (if you know):    H030530

Date of the court's decision:    12/26/2006

Result (attach a copy of the court's opinion or order, if available):

See Attachment C

(3) Did you receive a hearing on your motion or petition?           ☐ Yes     ☑ No

(4) Did you appeal from the denial of your motion or petition?       ☑ Yes     ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☑ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

California Supreme Court
San Francisco, CA

Docket or case number (if you know):    S149931

Date of the court's decision:    4/18/2007

Result (attach a copy of the court's opinion or order, if available):

See Attachment D

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four:

AO 241
(Rev. 12/04)

13.   Please answer these additional questions about the petition you are filing:

    (a)   Have all grounds for relief that you have raised in this petition been presented to the highest state court
        having jurisdiction?   ☑  Yes   ❐  No
        If your answer is "No," state which grounds have not been so presented and give your reason(s) for not
        presenting them:

    (b)   Is there any ground in this petition that has not been presented in some state or federal court? If so,
        ground or grounds have not been presented, and state your reasons for not presenting them:

14.   Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction
      that you challenge in this petition?   ❐  Yes   ☑  No
      If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues
      raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy
      of any court opinion or order, if available.

15.   Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for
      the judgment you are challenging?   ❐  Yes   ☑  No
      If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the
      raised.

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:


(b) At arraignment and plea:


(c) At trial:

Cory Linstrom, Esq.
65 E. Taylor Street, San Jose, CA 95112

(d) At sentencing:

Same as above

(e) On appeal:

Dallas Sacher, Esq.
100 N. Winchester Blvd., Ste. 310, Santa Clara, CA 95050

(f) In any post-conviction proceeding:

Same as above

(g) On appeal from any ruling against you in a post-conviction proceeding:

Same as above


17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are

challenging?         ☐ Yes    ☑ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:



(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the

future?         ☐ Yes    ☐ No

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain

the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

AO 241
(Rev. 12/04)

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C.   § 2244(d) provides in

part that:

(1)     A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in
        custody  pursuant to the judgment of a State court. The limitation period shall run from the latest of -

        (A)     the date on which the judgment became final by the conclusion of direct review or the expiration
                of the time for seeking such review;

        (B)     the date on which the impediment to filing an application created by State action in violation of
                the Constitution or laws of the United States is removed, if the applicant was prevented from
                filing by such state action;

        (C)     the date on which the constitutional right asserted was initially recognized by the Supreme
                Court, if the right has been newly recognized by the Supreme Court and made retroactively
                applicable to cases on collateral review; or

        (D)     the date on which the factual predicate of the claim or claims presented could have been
                discovered through the exercise of due diligence.

AO 241
(Rev. 12/04)

Page 16

(2)   The time during which a properly filed application for State post-conviction or other collateral review
      with respect to the pertinent judgment or claim is pending shall not be counted toward any period of
      limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:
Reversal of all counts of conviction.

or any other relief to which petitioner may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for

Writ of Habeas Corpus was placed in the prison mailing system on _____ (month, date, year).

Executed (signed) on    2 - 15 - 08    (date).

_____

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

IN FORMA PAUPERIS DECLARATION

_____

[insert appropriate court]

* * * * *

## Attachment A

1.  Violation of the Sixth and Fourteenth Amendment right to the effective assistance of trial counsel due to counsel's omission to seek exclusion of the defendant's incriminating statements made to the police.

2.  Violation of the Sixth and Fourteenth Amendment right to the effective assistance of trial counsel due to counsel's failure to object to the evidence that Karely saw Laura leave defendant's room with a red stain on her clothes and counsel's failure to request CALJIC Nos. 2.50.1 and 2.50.2 with regard to the evidence.

3.  Violation of the Sixth and Fourteenth Amendment right to the effective assistance of trial counsel due to counsel's omission to move for exclusion of the evidence that the defendant used drugs and fought with the police.

4.  Violation of the Sixth and Fourteenth Amendment right to the effective assistance of trial counsel due to the cumulative prejudice flowing from the three errors committed by counsel.

# ATTACHMENT B



**FILED**

MAR 1 0 2006

Court of Appeal - Sixth App. Dist.

By _____

DEPUTY

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

PEOPLE OF THE STATE OF CALIFORNIA, ]

              Plaintiff and Respondent,    ]

vs.

JESUS VALENCIA,

              Defendant and Appellant.    ]

] NO. H029370

] (SANTA CLARA CO.
] SUPERIOR COURT
] NO. CC460324)

### APPELLANT'S OPENING BRIEF

### ON APPEAL FROM THE JUDGMENT OF THE
### SUPERIOR COURT, COUNTY OF SANTA CLARA,
### THE HONORABLE GILBERT T. BROWN, JUDGE PRESIDING

### SIXTH DISTRICT APPELLATE PROGRAM

DALLAS SACHER
Assistant Director
State Bar #100175
100 N. Winchester Blvd., Suite 310
Santa Clara, CA 95050
(408) 241 -6171

Attorneys for Appellant,
Jesus Valencia

1 0 2006

## TABLE OF CONTENTS

Statement of Appealability .................................... 1

Statement of the Case ....................................... 1

STATEMENT OF FACTS .................................... 4

Overview ................................................. 4

The Family History ......................................... 4

The Initial Report to Ms. Correa and CPS ........................ 8

The Report To Ms. Sandoval And The Police ..................... 9

The Police Interviews ....................................... 9

Counts 1-5 (Denisse) ...................................... 11

Count 1 ................................................ 11

Count 2 ................................................ 12

Count 3 ................................................ 13

Count 4 ................................................ 13

Count 5 ................................................ 13

Counts 6-10(Karely) ...................................... 13

Count 6 ................................................ 14

Count 7 ................................................ 15

Count 8 ................................................ 15

Count 9 ................................................ 15

**TABLE OF CONTENTS (CONTINUED)**

Count 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Count 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Count 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Testimony Regarding The Child Sexual Abuse Accommodation Syndrome
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Laura's Explanation As To Why She Lied About Being Molested . . . . . 17

Denisse's Explanation As To Why She Lied About Being Molested . . . 18

Karely's Explanation As To Why She Lied About Being Molested . . . . 19

Appellant's Explanation As To Why He Falsely Admitted Acts Of
Molestation To The Police . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Evidence Indicating That Karely, Denisse And Laura Were Exposed to
Pornography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I.      APPELLANT WAS DEPRIVED OF THE EFFECTIVE
        ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
        FOURTEENTH AMENDMENTS WHEN HIS TRIAL
        ATTORNEY FAILED TO MOVE FOR THE EXCLUSION
        OF THE INCRIMINATING STATEMENTS WHICH
        APPELLANT MADE TO THE POLICE . . . . . . . . . . . . . . . . . . 22

II.     APPELLANT WAS DEPRIVED OF THE EFFECTIVE
        ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
        FOURTEENTH AMENDMENTS WHEN HIS TRIAL
        ATTORNEY FAILED TO OBJECT TO THE EVIDENCE
        THAT KARELY SAW LAURA LEAVE APPELLANT'S
        ROOM WITH A "RED STAIN" ON HER CLOTHES.
        ALTERNATIVELY, APPELLANT PERFORMED
        INEFFECTIVELY WHEN HE FAILED TO REQUEST
        CALJIC NOS. 2.50.1 AND 2.50.2 . . . . . . . . . . . . . . . . . . . . . . . . . 39

## TABLE OF CONTENTS (CONTINUED)

A.     The Evidence Should Have Been Excluded As
Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B.     Assuming Arguendo That The Evidence Was
Marginally Relevant, It Should Have Been
Excluded Pursuant To Evidence Code Section
352. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

C.     Defense Counsel Erred By Failing To Request
That CALJIC Nos. 2.50.1 And 2.50.2 Be Given . . . . . . . . 46

D.     Appellant Was Severely Prejudiced By
Admission Of The "Red Stain" Evidence. . . . . . . . . . . . . 48

III.   APPELLANT WAS DEPRIVED OF THE EFFECTIVE
ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS WHEN HIS TRIAL
ATTORNEY FAILED TO MOVE FOR THE EXCLUSION
OF THE HIGHLY PREJUDICIAL EVIDENCE THAT HE
USED DRUGS AND FOUGHT WITH THE POLICE. . . . . . . . . 50

IV.   THE ENTIRE JUDGMENT MUST BE REVERSED DUE TO
THE CUMULATIVE PREJUDICE FLOWING FROM THE
THREE ERRORS IDENTIFIED ABOVE. . . . . . . . . . . . . . . . . . 53

V.   THE PENAL CODE SECTION 288.5 CONVICTION
INVOLVING DENISSE MUST BE REVERSED SINCE
APPELLANT WAS DEPRIVED OF THE EFFECTIVE
ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS WHEN HIS ATTORNEY
FAILED TO RENDER A LACK OF PERSONAL
KNOWLEDGE OBJECTION TO ADMISSION OF LAURA'S
HEARSAY STATEMENT THAT APPELLANT HAD BEEN
MOLESTING DENISSE SINCE SHE WAS FOUR YEARS
OLD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

## TABLE OF AUTHORITIES

### CASES

*Arizona v. Fulminante* (1991)
    499 U.S. 279 ............................................................................. 36,37

*Hutto v. Ross* (1976)
    429 U.S. 28 .................................................................................... 23

*In re Jones* (1996)
    13 Cal.4th 552 ............................................. 23,45,46,50,51,52,53,57

*In re Shawn D.* (1993)
    20 Cal.App.4th 200 ......................................................................... 35

*Miller v. Pate* (1967)
    386 U.S. 1 ...................................................................................... 43

*People v. Alcala* (1984)
    36 Cal.3d 604 ................................................................................. 37

*People v. Benson* (1990)
    52 Cal.3d 754 ................................................................................. 35

*People v. Brooks* (1979)
    88 Cal.App.3d 180 .......................................................................... 38

*People v. Cahill* (1993)
    5 Cal.4th 478 .................................................................................. 33

*People v. Cardenas* (1982)
    31 Cal.3d 897 ............................................................................. 38,50

*People v. Cooper* (1991)
    53 Cal.3d 771 ................................................................................. 23

*People v. Cruz* (1964)
    61 Cal.2d 861 ................................................................................. 38

## TABLE OF AUTHORITIES (CONTINUED)

*People v. Daniels* (1991)
52 Cal.3d 815 ........................................................................... 57,58

*People v. Davis* (1965)
233 Cal.App.2d 156 .......................................................................... 52

*People v. De La Plane* (1979)
88 Cal.App.3d 223 ..................................................................... 43,44

*People v. Deeney* (1983)
145 Cal.App.3d 647 .................................................................... 51,52

*People v. Gonzales* (1902)
136 Cal. 666 ............................................................................ 33,34

*People v. Green* (1980)
27 Cal.3d 1 ..................................................................................... 43

*People v. Harris* (1998)
60 Cal.App.4th 727 .............................................................. 45,46,49

*People v. Hill* (1998)
17 Cal.4th 800 .......................................................................... 53,54

*People v. Hogan* (1982)
31 Cal.3d 815 ................................................................ 23,24,31,32

*People v. Holloway* (2004)
33 Cal.4th 96 .................................................................................. 34

*People v. Morrison* (2004)
34 Cal.4th 698 ................................................................................ 42

*People v. Neal* (2003)
31 Cal.4th 63 ........................................................................ 23,32,33

*People v. Sam* (1969)
71 Cal.2d 194 .......................................................................... 51,52

## TABLE OF AUTHORITIES (CONTINUED)

*People v. Simon* (1986)
   184 Cal.App.3d 125 ........................................................................ 48

*People v. Thomas* (1978)
   20 Cal.3d 457 ................................................................................ 37

*People v. Thompson* (1990)
   50 Cal.3d 134 ....................................................................... 24,31,32

*People v. Trout* (1960)
   54 Cal.2d 576 ................................................................................ 33

*People v. Vasila* (1995)
   38 Cal.App.4th 865 ........................................................................ 35

*People v. Woodard* (1979)
   23 Cal.3d 329 ................................................................................ 38

*Strickland v. Washington* (1984)
   466 U.S. 668 ................................................... 22,23,36,38,48,51,59

## CONSTITUTIONS

United States Constitutions
   Fifth Amendment .......................................................................... 23
   Sixth Amendment .......................................................... 22,29,50,55
   Fourteenth Amendment ............................................. 22,23,39,50,55

## STATUTES

Evidence Code
   Section 210 ................................................................................ 42
   Section 352 ........................................................................... 45,46
   Section 702 ................................................................................ 57
   Section 1108 .............................................................................. 46

Penal Code
   Section 220 ............................................................................... 2,3

## TABLE OF AUTHORITIES (CONTINUED)

Section 288, subdivision (a) ....................................................... 2,3,4
Section 288, subdivision (b) ....................................................... 2,3,4
Section 288.5, subdivision (a) ........................ 2,3,11,14,22,55,56,69
Section 664 ....................................................................................... 2
Section 1237 ...................................................................................... 1

## MISCELLANEOUS

CALJIC No. 2.50.1 ...................................................................... 47
CALJIC No. 2.50.2 ..................................................... 39,46,47,48

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

PEOPLE OF THE STATE OF CALIFORNIA, ]
                                         ] NO. H029370
        Plaintiff and Respondent,    ]
                                           ] (SANTA CLARA CO.
vs.                                    ] SUPERIOR COURT
                                           ] NO. CC460324)
JESUS VALENCIA,                       ]
                                           ]
        Defendant and Appellant.    ]
_____ ]

## Statement of Appealability

The instant appeal is taken from a final judgment imposed following

a jury trial. The judgment is appealable pursuant to Penal Code section 1237.

## Statement of the Case

On November 19, 2004, appellant was charged in an information filed

in the Santa Clara County Superior Court. (CT 176-185.) On January 31,

2005, a first amended information was filed. (CT 214-223.)

On January 31, 2005, a jury trial commenced. (CT 225.) On February

15, 2005, the People rested their case. (CT 269.)

On February 17, 2005, a second amended information was filed. (CT

276-285.) Count 1 alleged the commission of continuous sexual abuse against

1

Denisse Doe (Penal Code section 288.5, subd. (a)). (CT 278.) Count 2 alleged the commission of a lewd and lascivious act against Denisse Doe (Penal Code section 288, subd. (a)). (CT 278.) Count 3 alleged the commission of a lewd and lascivious act against Denisse Doe (Penal Code section 288, subd. (a)). (CT 279.) Count 4 alleged the attempted commission of a lewd and lascivious act against Denisse Doe (Penal Code sections 288, subd. (a) and 664). (CT 279-280.) Count 5 alleged the commission of a lewd and lascivious act against Denisse Doe (Penal Code section 288, subd. (a)). (CT 280.) Count 6 alleged continuous sexual abuse against Karely Doe (Penal Code section 288.5, subd. (a)). (CT 280-281.) Count 7 alleged assault with intent to commit a lewd and lascivious act against Karely Doe (Penal Code section 220). (CT 281.) Count 8 alleged the commission of a lewd and lascivious act against Karely Doe (Penal Code section 288, subd. (a)). (CT 281-282.) Count 9 alleged the attempted commission of a lewd and lascivious act against Karely Doe (Penal Code sections 288, subd. (a) and 664). (CT 282.) Count 10 alleged the commission of a lewd and lascivious act against Karely Doe (Penal Code section 288, subd. (a)). (CT 282-283.) Count 11 alleged the commission of a lewd and lascivious act by force against Laura Doe (Penal Code section 288, subd. (b)). (CT 283.) Count 12 alleged the commission of a lewd and lascivious act by force against Laura Doe (Penal

2

Code section 288, subd. (b)).  (CT 284.)

On February 22, 2005, the parties delivered their closing arguments.
(CT 291-292.)  On February 23, 2005, jury deliberations commenced.  (CT
295.)  On March 2, 2005, a mistrial was declared when the jury was unable to
reach any verdicts.  (CT 313-314.)

On May 9, 2005, the People filed a third amended information.  (CT
407-416.)  The information was identical to the preceding information except
that:  (1) count 4 alleged a completed violation of Penal Code section 288,
subdivision (a) in lieu of an attempted violation; (2) count 7 alleged a
violation of Penal Code section 288, subdivision (a) in lieu of a violation of
Penal Code section 220; and (3) count 9 alleged a completed violation of
Penal Code 288, subdivision (a) in lieu of an attempted violation.  (CT 407-
416.)

On May 10, 2005, a jury trial commenced.  (CT 420.)  On May 26,
2005, the jury returned its verdicts.  (CT 1049.)  Appellant was found guilty
on counts 1, 6, 11 and 12 and was acquitted on the remaining counts.  (CT
1022-1041, 1049.)

On August 19, 2005, appellant was sentenced to 30 years in state
prison.  (CT 1087.)  Appellant received two consecutive 12 year terms for his
Penal Code section 288.5 convictions and two three year consecutive terms

3

for his Penal Code section 288, subdivision (b) convictions. (CT 1087.)

On September 16, 2005, a notice of appeal was filed. (CT 1089.)

## STATEMENT OF FACTS

### Overview

Appellant was 21 at the time of trial. It was the government's contention that appellant repeatedly molested his younger sisters, Denisse, Karely and Laura. The ages of the sisters were 8, 10 and 14 at the time of trial.

In their trial testimony, each of the sisters denied that appellant had molested them. However, various prior statements were offered wherein acts of molestation were specified.

Appellant testified at trial that he had not committed any acts of molestation. Although he had previously admitted several acts of molestation during a police interview, appellant testified that the police had encouraged him to give a false statement since it would be in his family's best interests if he confessed.

### The Family History

Maria Villanueva and Jesus Valencia, Sr. had five children together: Juana, Lupe, Norma, appellant and Laura. (RT 774-775.) In 1992, Mr. Valencia moved to Mexico and took Lupe, Norma and appellant with him.

4

(RT 776.) Ms. Villanueva remained in the United States with Juana and Laura. (RT 776.)

In 1993, Ms. Villanueva arrived in San Jose. (RT 777.) Subsequently, Ms. Villanueva took up with Daniel Velasquez. (RT 779.) Karely, Denisse and Daniel were born to Ms. Villanueva and Mr. Velasquez. (RT 758.)

Mr. Valencia was not a good father in that he did not send any child support from Mexico. (RT 778.) Similarly, Mr. Valencia did not send any birthday or Christmas gifts to his children in the United States. (RT 741, 778-779.)

Norma did not enjoy living with Mr. Valencia in Mexico. (RT 230.) According to Norma, Mr. Valencia did not act as a responsible parent. (RT 730.) In addition, he struck both herself and appellant. (RT 730-731.)

Eventually, the entire family moved back to the United States. In 1996, Lupe moved to San Jose. (RT 777.) Appellant followed in 2000 and Norma arrived the following year. (RT 682-683.) Mr. Valencia came as well. (RT 739-740.)

Ms. Villanueva and Mr. Velasquez owned a four bedroom home. (RT 781-782.) At one time, Norma and Laura shared a bedroom. (RT 782.) However, when Lupe got married in 2002 and moved out, Laura got her own room. (RT 782, 816.) Appellant had his own room and Karely, Denisse and

5

Daniel slept in their parents' room. (RT 782-783.)

In 2001, Norma told Ms. Villanueva that her natural father, Mr. Valencia, had molested her by touching her genitals. (RT 724-725.) At trial, Norma indicated that this allegation was untrue. (RT 698.) Norma made up the allegation because Mr. Valencia had beaten her. (RT 730-731.) Although she hoped that Mr. Valencia would be deported, Norma admitted that she sat with him during prior court proceedings. (RT 735, 753.)

In October 2002, Norma was hospitalized after she cut her wrists and "had some problems taking pills." (RT 725, 737.) On this occasion, Norma again falsely indicated that Mr. Valencia had molested her. (RT 725, 737.)

Following these events, Norma told Laura that she had lied about being molested by Mr. Valencia. (RT 726.) Laura believed that the lie was acceptable since Norma did not like her father. (RT 726-727.)

There was a fair amount of violence in the Villanueva-Velasquez household. According to school aide David Correa, Laura came to school about once a week with bruises and bite marks. (RT 404.) Laura reported that her brother and other siblings caused the bruising. (RT 405, 427-428, 438.) Ms. Villanueva indicated that appellant was also violent with Denisse and Karely. (RT 824.) Ms. Villanueva told Laura that appellant needed counseling since "he's really violent." (CT 596.)

6

In February 2003, Mr. Velasquez struck Laura with a belt. (RT 766.) When Child Protective Services (CPS) investigated the episode, Ms. Villanueva took responsibility for the act. (RT 818.) She did so since Mr. Velasquez was supporting the family. (RT 818.)

Ms. Villanueva suffered from depression for which she took medication. (RT 818-819.) On at least two occasions (June 2003 and February 2004), Ms. Villanueva moved out of the house. (RT 819.) Ms. Villanueva told her children that she was staying away due to her medication. (RT 820.) However, the true reason was that she was fighting with Mr. Velasquez. (RT 819-820.)

Between September 2003 and July 2004, Ms. Villanueva employed a young woman, Evelina, to assist her in caring for her children. (RT 793-795.) Evelina took Karely, Denisse and Daniel to school in the morning and picked up the children in the afternoon. (RT 795-796.) Evelina remained at home with the children until either Ms. Villanueva or Mr. Velasquez got home from work. (RT 797-798.) Notwithstanding Ms. Villanueva's testimony concerning this arrangement, no one made any mention of Evelina when social worker Sylvia Roque spoke to Ms. Villanueva and the children in July 2004. (RT 968-969.)

Mr. Velasquez was self employed as a trash hauler. (RT 760.) Around May 20, 2004, appellant began to work full-time with Mr. Velasquez. (RT

7

830-831.) The men worked seven days a week from 7 a.m. to 7 p.m. (RT 762, 832.)

<u>The Initial Report to Ms. Correa And CPS</u>

Rosalie Correa was employed as an instructional aide by the Evergreen School District. (RT 408.) In the fall of 2003, Laura told Ms. Correa that she had seen appellant "kissing Karely on her mouth." (RT 413.) Although Ms. Correa has a mandatory duty to report any allegation of child abuse, she made no report to CPS since she "didn't think to report it." (RT 422-423.)

In early 2004, Laura told Ms. Correa that appellant had removed her blouse while they "were horse playing." (RT 445-446, 450.) Ms. Correa did not report the disclosure to CPS. (RT 445-446.)

In February 2004, Laura told Ms. Correa that appellant "had crawled into bed with her" during the preceding week. (RT 413.) Ms. Correa reported the incident to CPS. (RT 446.)

On February 12, 2004, social worker Colleen Kohtz paid a visit to Ms. Velasquez and appellant. (RT 810, 919-920.) At the meeting, appellant learned of Laura's allegation that he had tried to get in her bed. (RT 920.) As a result of the meeting, Ms. Velasquez told appellant that he should stay out of Laura's room. (RT 920-921.)

///

8

## The Report To Ms. Sandoval And The Police

Victoria Sandoval is a resource specialist at Evergreen School District. (RT 315.) In March 2004, Laura told her that appellant had tried to get in her bed. (RT 318-319, 334.) Subsequently, Laura told Ms. Sandoval that "her brother was touching her." (RT 333-334.) On March 15, 2004, Ms. Sandoval made a CPS report. (RT 335-336.) However, she did not include the allegation that appellant had tried to get in Laura's bed. (RT 337.)

In July 2004, Ms. Sandoval ran into Laura at a Walgreen's. (RT 320.) At the time, Laura was accompanied by Denisse and Karely. (RT 321.) Karely told Ms. Sandoval that appellant "had been sticking his hand in their underpants and touching them." (RT 322.)

Ms. Sandoval took the three children to her house and called CPS. (RT 323.) At approximately 8:30 p.m., the police arrived at Ms. Sandoval's house. (RT 323.)

## The Police Interviews

Officers Solis and Torres responded to Ms. Sandoval's call. (RT 360-361.) The officers interviewed Denisse, Karely and Laura. (RT 361-362.) The interviews were recorded and introduced into evidence. (RT 362-363.) The salient portions of the interviews are set forth in the sections which follow.

9

After being interviewed at Ms. Sandoval's home, the children were transported to the police station. (RT 506.) Shortly before 11 p.m., Detective Dillon began another round of interviews. (RT 506.) The interviews were recorded and introduced into evidence. (RT 508-510, 585-586.) The interviews concluded at 1 a.m. (RT 515.) The relevant portions of the interviews are set forth below.

On July 16, 2004, appellant was interviewed by Detectives Dillon and Tovar. (RT 515-516, 586-587.) The interview was recorded and introduced into evidence. (RT 528-529.) The relevant portions of the interview are set forth below.

At the conclusion of his interview, appellant wrote letters of apology to Karely and Laura. The letters provided:

"To: Karely

"You know, I feel very bad with you.

"I never thought you would take it so serious.

"So, I ask you to excuse me and for you to forgive me and like I am telling you, I say it to Laura, that I feel very bad if at times I made you feel bad. I wouldn't like it either if you, Laura and Denise stop confiding in me, that you are afraid of me. I love you like sisters and I feel very bad being here. I never thought this would happen so please excuse me and I hope that we do not separate from being together because Mom was crying yesterday and also today so that hurts me to see Mom cry. Well, I just hope this is clarified and you (guys) come back home to be all together again. Okay, I also ask you to excuse me for

10

touching your intimate (private) parts.

"Jesus, your brother" (People's Exhibit 12.)

"To Laura: Well Laura I am writing this to you to tell you or to excuse myself with you if some day I touched your intimate (private) parts. If I did it, I swear it was not with bad intentions and I am sorry for the day I pulled your blouse when I was playing with you. I say playing because that's the way I took it and I believe that you took it seriously. Nobody is forcing me to write you this letter. I am doing it of [sic] my own. Never did I believe that this was going to become all serious so excuse me and I promise you that I would never do that again and you have my word because I don't want you to be separated, not with other people that you don't even know. So, I ask a thousand excuses to you and to Kareli and Dennise, if at any time I offended you or I made you feed bad. That you had thought bad about me. I promise you (guys) that I am going to change with you in every way. Well, thank you.

"Jesus, your brother" (People's Exhibit 13.)

### Counts 1-5 (Denisse)

Denisse Doe was born on May 26, 1996. (RT 14.) During her trial testimony, Denisse indicated that appellant had not molested her. (RT 19, 68-69.) However, Denisse's testimony was contradicted by earlier statements which she and Karely had given.

### Count 1

Count 1 alleged the commission of continuous sexual abuse within the meaning of Penal Code section 288.5. In addition to the acts specified in counts 2-5, the prosecutor relied on additional uncharged acts as well. (See

11

RT 1009 [prosecutor cites uncharged acts in his closing argument].)

Gabriella Nielsen testified regarding the uncharged acts. Ms. Nielsen is a family therapist who provided counseling to Denisse from September 2004 to February 2005. (RT 465-466.)

During a September 2004 session, Denisse told Ms. Nielsen that appellant "had touched her in her private area in the front of her body." (RT 467-468.) According to Denisse, appellant "caressed" her. (RT 468.)

On October 5, 2004, Ms. Nielsen met with Denisse and her mother. (RT 469.) Denisse reported that "her brother had pulled down her pants and touched her private parts and touched her private parts with his penis." (RT 469.)

### Count 2

On July 15, 2004, Karely was interviewed by the police. (CT 465.) Karely recounted an incident which had occurred in her mother's room several days earlier. (CT 477.) Karely indicated that she came out of the bathroom and saw appellant taking Denisse's clothes off. (CT 477.) Denisse was on the floor and appellant had pulled her pants down to her knees. (CT 480.) Karely seized a "big thing" made out of wood and struck appellant in the face. (CT 482.)

///

12

### Count 3

Karely recounted an incident which occurred at 5 p.m. on a hot afternoon. (CT 572.) Karely indicated that she and Denisse were sleeping in their parents' room. (CT 572.) Karely said that she and Denisse awoke when appellant was touching their genitals under their underwear. (CT 572-574.) In order to resist appellant, Karely got a "thing" and hit him. (CT 573.)

### Count 4

Denisse told the police about an episode where appellant invited her and Karely to see the new fish which he had in his room. (CT 862.) On this occasion, appellant was able to slightly pull her pants down and attempted to touch her genitals. (CT 458, 865-866.) Appellant desisted from this activity when their father knocked on the door. (CT 861.)

### Count 5

Two days prior to her police interview, Denisse was watching television with appellant. (CT 447-448, 880-882.) Appellant kissed her on the lips. (CT 443, 450.)

### Counts 6-10 (Karely)

At trial, Karely denied that appellant had ever molested her. (RT 88, 144.) However, the prosecutor presented her contrary pretrial statements.
///

13

Count 6

Count 6 alleged continuous sexual abuse against Karely within the meaning of Penal Code section 288.5. In addition to the acts alleged in counts 7-10, the prosecutor relied on other uncharged acts. (RT 1015-1016 [prosecutor cites uncharged acts in his closing argument].)

In her October 5, 2004 session with Ms. Nielsen, Denisse recalled an incident in her backyard. (RT 470-471.) On that occasion, Denisse saw appellant place his penis in Karely's mouth under a fig tree. (RT 471.)

In his July 16, 2004 interview with the police, appellant also admitted committing several touchings of Karely. Four years earlier, Karely was sleeping on a bed when appellant entered to watch television. (CT 818-819.) On this occasion, appellant accidentally touched Karely over her panties. (CT 820-822.)

Six months later, appellant was joking with Karely and asking her where her "little testicles" were. (CT 813-815.) On that occasion, appellant touched Karely's genitals over her clothes. (CT 815.)

In the year preceding his interview, appellant was lying with Karely as they watched television. (CT 828-829.) Appellant touched Karely's vagina under her clothes. (CT 831, 833.) The touching lasted for three to four minutes. (CT 831.)

14

## Count 7

On July 15, 2004, Karely was interviewed by the police. (CT 530.) A week before the interview, Karely was watching television in her mother's room. (CT 564.) Appellant entered the room and pulled her pants down to her knees. (CT 565-566.) Karely resisted the touching and hit appellant with "a wooden thing." (CT 565.)

## Count 8

About a year before her police interview, Karely was in appellant's company. (CT 556.) Appellant rubbed Karely's chest under her shirt. (CT 559.)

## Count 9

Karely told the police that appellant had invited her and Denisse into his bedroom to see his new fish. (CT 484-485.) According to Denisse, appellant pulled Karely's pants down a "little bit." (CT 869.)

## Count 10

The evidence relating to count 10 is identical to that which was employed with regard to count 3. (See p. 13, supra.)

## Count 11

At trial, Laura denied that appellant had molested her. (RT 175-176.) However, the prosecutor adduced Laura's contrary pretrial statements.

15

In March 2004, Laura was sitting on the floor as she watched television. (CT 610, 619.) Appellant touched Laura's crotch through her clothing. (CT 617-618.) Laura and appellant struggled for a time until one of appellant's friends came over. (CT 622-623.)

Count 12

Later the same day, appellant took Laura's keys and grabbed her. (CT 610, 623-624.) Appellant picked up Laura and threw her to the ground. (CT 611.) As they struggled over the keys, appellant unhooked Laura's bra. (CT 612-613.) Although appellant removed Laura's bra, he did not touch her chest. (CT 508.)

### Testimony Regarding The Child Sexual Abuse Accommodation Syndrome

Carl Lewis is a criminal investigator for the District Attorney's Office. (RT 605.) Although it took him "many years" to obtain a college degree, Mr. Lewis is an expert on the child sexual abuse accommodation syndrome. (RT 610-611.)

According to Mr. Lewis, there are five myths regarding the manner in which sexually abused children are said to act. (RT 613.) These myths involve secrecy, helplessness, entrapment and accommodation, delayed, conflicted and unconvincing disclosure and retraction. (RT 614.)

With respect to retraction, Mr. Lewis testified that it is common for children to withdraw their allegations of having been molested. (RT 631.)

This is so because family members "could go to the child and say things like, look at all the trouble you've caused because you told, but look at what's happened because you told, we don't get to live in our house because you told, we won't have as nice a Christmas this year." (RT 631.)

### Laura's Explanation As To Why She Lied About Being Molested

Laura testified that she was jealous of appellant since her mother "gave him money and stuff" which she did not receive. (RT 190.) In addition, Laura was jealous since appellant could go out with his friends whereas she could not. (RT 190.) Laura was also "mad" at appellant since they often fought. (RT 195-196.) Laura indicated that appellant would bruise her during their fights which would occur at least once a week. (RT 296-297.)

With regard to the statements made by Denisse and Karely, Laura testified that she told her sisters to tell Ms. Sandoval that appellant had molested them. (RT 196-197.) The plan to implicate appellant was hatched two weeks before the girls saw Ms. Sandoval at the Walgreen's. (RT 196-198.) Laura threatened to spank her sisters if they did not go along with her plan. (RT 202.)

Laura drew her inspiration for the conspiracy from Norma's prior experience in falsely implicating their father as a child molester. (RT 201-202.) Laura gave Denisse and Karely the "story about fishes" and the "story

17

about being touched in [their] mother's room." (RT 202.)

The prosecutor impeached Laura's recantation by noting that she had not mentioned her jealousy during her prior testimony. (RT 193.) Rather, Laura had testified only that she was "mad" at appellant because they frequently fought. (RT 195.) In addition, Laura was impeached with her prior testimony that the plan did not occur to her until the very day that she went to Walgreen's. (RT 213.)

The prosecutor also adduced the fact that Laura and her sisters were placed in a foster home for three weeks subsequent to appellant's arrest. (RT 242.) Laura admitted that she did not like the foster home since she missed her mother and family. (RT 242.)

Finally, Ms. Correa recalled an August 2004 conversation with Laura. (RT 416.) According to Ms. Correa's notes of the conversation, Laura said that her mother instructed her to say that nothing happened or else Laura and her sisters would be "taken away again" and "bad things" would happen to appellant in jail or prison. (People's Exhibit 15.)

### Denisse's Explanation As To Why She Lied About Being Molested

Denisse testified that she was mad at appellant because he had taken her "things". (RT 54.) However, at other points in her testimony, Denisse could not explain why she lied. (RT 26, 60.)

18

Denisse testified that she had been unhappy living at her foster home.

(RT 32.) She was also sad that appellant was no longer living at home. (RT

33.)

### Karely's Explanation As To Why She Lied About Being Molested

Karely testified that she was mad at appellant because he had a

tendency to discard her toys. (RT 147.) As a result, she was eager to get

appellant out of the house. (RT 147.) Denisse and Laura shared this goal.

(RT 148.)

The prosecutor brought out that Karely had previously testified in

November that she had lied because she was scared. (RT 160.) However, in

her February testimony, Karely could not recall why she had lied. (RT 160-

161.) Karely also admitted that she felt bad since appellant was no longer

living at home. (RT 164.)

### Appellant's Explanation As To Why He Falsely Admitted Acts Of Molestation To The Police

In his trial testimony, appellant denied that he had committed any of the

acts of molestation with which he was charged. (RT 895, 899-901, 904-906,

908.) While appellant admitted that he had taken Laura's keys and tussled

with her, he denied that he had grabbed her crotch or removed her shirt or

unsnapped her bra. (RT 862-866, 908.)

19

Appellant testified that he made incriminating comments to the police since he believed that his sisters would be returned home if he did so. (RT 900.) Appellant's testimony was corroborated by many of the comments made by the police during the course of his interrogation.

Near the beginning of the interview, the police told appellant that his sisters could not be returned home unless he told "the truth." (CT 688.) Thereafter, the police relentlessly advised appellant that he was not telling the truth when he denied that he had molested his sisters. (CT 717, 724, 757, 766.) Eventually, the police warned appellant that his sisters would have to go to court if he did not incriminate himself. (CT 784-786.) Given the pressure from the police, appellant confessed because he did not want the case to go to court. (CT 824.)

As a further explanation for his false confession, appellant indicated that he felt guilty because his mother's favorable treatment toward him had induced his sisters to make up their false allegations. (RT 961-962.) Appellant regretted that he had not moved out earlier when his sisters told him to leave. (RT 961.)

### Evidence Indicating That Karely, Denisse And Laura Were Exposed To Pornography

Ms. Villanueva testified that her cousin had left two or three pornographic magazines at her house. (RT 838.) The girls saw the

20

magazines. (RT 838.) In addition, appellant indicated that he had seen Karely and Denisse watching pornographic movies on cable television. (CT 792-793.)

The prosecutor sought to impeach Ms. Villanueva's testimony by calling social worker Sylvia Roque. In July 2004, Ms. Roque interviewed Ms. Villanueva. (RT 968-969.) Ms. Villanueva made no mention of the magazines during the interview. (RT 969.)

## INTRODUCTION

This was a closely contested case. Although three of appellant's sisters told the police that he had molested them, each of the sisters retracted her allegation prior to trial. Each of the sisters also offered plausible explanations as to why appellant had been falsely accused. Given the contradiction in the evidence, the first jury could not reach a verdict and the second jury struggled through eight hours of deliberations before convicting appellant.

As will be amply shown in this brief, appellant would not have been convicted had his attorney performed effectively. Defense counsel committed four fundamental and highly prejudicial errors: (1) he failed to obtain exclusion of appellant's damaging admissions; (2) he failed to obtain exclusion of the evidence that Laura emerged from appellant's room one morning with a "red stain" on her clothes; (3) he failed to obtain exclusion of

21

the evidence that appellant fought with the police and possibly used drugs; and (4) he failed to obtain exclusion of the only evidence which proved the "more than three months" element of the Penal Code section 288.5 count involving Denisse. Given the cumulative weight and significance of these errors, the jury was unfairly swayed in its review of the closely balanced facts.

It is a well known axiom that a defendant is entitled only to a fair trial, not a perfect one. Appellant did not receive a fair trial. The serious mistakes made by defense counsel compel reversal in this case.

I.

APPELLANT WAS DEPRIVED OF THE EFFECTIVE
ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS WHEN HIS TRIAL
ATTORNEY FAILED TO MOVE FOR THE EXCLUSION
OF THE INCRIMINATING STATEMENTS WHICH
APPELLANT MADE TO THE POLICE.

A successful claim of ineffective assistance of counsel requires a two part showing. First, the defendant must demonstrate that his attorney's performance fell below the objective standard of prevailing professional norms. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) Second, the defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

22

With regard to prong one of the *Strickland* test, it is unquestionably counsel's duty to seek exclusion of evidence which is harmful to the defendant's cause. (*In re Jones* (1996) 13 Cal.4th 552, 581.) In this case, defense counsel made no attempt to seek exclusion of the incriminating oral and written statements which appellant made to the police. Insofar as the statements were obtained in violation of the due process clause of the federal Constitution, counsel performed ineffectively. Moreover, admission of the statements constitutes reversible error.

It is a central principle of the Fifth and Fourteenth Amendments that the police may not extract admissions from a suspect by making"'"' direct or implied promises, however slight, [or] by the exertion of any improper influence.'" [Citation.]" (*Hutto v. Ross* (1976) 429 U.S. 28, 30.) "'[A]ny promise made by an officer or person in authority, express or implied, of leniency or advantage to the accused, if it is a motivating cause of the confession, is sufficient to invalidate the confession and to make it involuntary and inadmissible as a matter of law.' [Citation.]" (*People v. Hogan* (1982) 31 Cal.3d 815, 838, overruled on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.)

In addition, it is highly coercive for the police to interrogate a suspect by alternating threats with promises. (*People v. Neal* (2003) 31 Cal.4th 63, 84

["[p]romises and threats traditionally have been recognized as corrosive of voluntariness."].) Such a methodology will lead to exclusion of a defendant's statements if the record shows that the "psychological coercion" visited upon the defendant was such as to overcome his free will. (*Hogan, supra,* 31 Cal.3d 815, 841.) In determining whether the defendant's free will has been overborne, a reviewing court must examine "the totality of the circumstances . . ." (*People v. Thompson* (1990) 50 Cal.3d 134, 166.)

In the case at bar, the police engaged in a highly clever and relentless interrogation of appellant where they used two improper themes which turned on promises of "leniency or advantage." The two themes were that: (1) admissions made by appellant would benefit his family; and (2) the admissions would "help" appellant since he would avoid having to go to court. Balanced against these benefits was the repeated threat that the failure to confess would lead to court proceedings which would harm appellant and his family. Without doubt, these techniques rendered appellant's statements inadmissible. The record which supports this conclusion is as follows.

On the morning of July 16, 2004, appellant came to the police station with his parents. (RT 515, CT 652.) After meeting with appellant in the lobby, Detective Dillon took appellant to an interview room. (RT 516.) Appellant was not given his *Miranda* rights. However, he was told that he

24

was not under arrest and was "free to leave at any time." (CT 654.)

Thereafter, Detective Dillon and Detective Tovar conducted a tag team

interrogation. (CT 652-842.) As Detective Tovar conceded at trial, appellant

did not make any incriminating statements until the interrogation had been in

progress for two hours and twenty minutes. (RT 590.) Leading up to

appellant's admissions, the detectives employed an escalating series of

coercive tactics.

As a preliminary tactic, the detectives began to soften up appellant by

falsely indicating that they had no intention of seeking charges against him.

This tactic is evidenced by three separate statements.

> "Dillon: You have to have the respect of your family in order to
> run your household. I understand that, so there's, there's *don't
> be overly concerned that I'm tryin' to get you in trouble or get
> somebody else in trouble. That's not it."* (CT 665, emphasis
> added.)

> "Dillon: *I don't want you to feel, you know, concerned. Overly
> concerned.* So don't start stressing over these little things,
> because as I ask you questions, in a few minutes, I can't believe
> you if you're gonna lie about this." (CT 685, emphasis added.)

> "Dillon: Hey, I told you, you're not under arrest, and you can,
> you can walk out right now. *I'm not trying to arrest you.*
> Okay? I wanna talk to you and find out what's going on." (CT
> 687, emphasis added.)

Following the introductory remarks which were intended to persuade

appellant that he was not in legal danger, the detectives turned to their primary

25

themes that appellant needed to confess in order to assist his family and to

avoid court proceedings. Of course, these benefits were often couched via the

threat that appellant would necessarily go to court if he did not confess. In

addition, the officers also made the threat that appellant's sisters would not

return home until he told them what they wanted to hear.

> "Dillon: I can't send them back in the house unless I know the truth." (CT 688.)

> "Dillon: "All right, but if you start lying to me, this is done. I'm not gonna talk to you, I'm just gonna write a report. *And then they'll arrest you later.* Okay? You understand what I'm sayin'?" (CT 717, emphasis added.)

> "Dillon: But if you lie to me about it, I'm just gonna write a report, *and you'll go to jail later.* Okay? Tell me what happened." (CT 717, emphasis added.)

> "Dillon: Are you gonna get in trouble for this? I don't know." (CT 719.)

> "Tovar: "If you tell lies it will be worse in this case. Do you understand me?" (CT 724.)

> "Dillon: Okay? Is it, are you a bad person because that happened? No. You're a guy. You have needs." (CT 744.)

> "Dillon: "Well, sometimes when you're wrestling, playing with your sister, maybe it just happens, because you know, maybe you're not thinking or maybe it just kind of, like a joke, okay? Touch and that was it. You know what? *That's, does it make you a bad person? No.* But we need to talk about that, okay?" (CT 745, emphasis added.)

> "Tovar: "Well, you need to remember. You need to remember, 'cause if, you know, we can't believe 'ya, if we don't believe

26

you what you're telling me the truth, or think that you're hiding it, *then we gotta do something.*"  (CT 757, emphasis added.)

"Tovar: "Okay, but, but not telling the truth about this is only gonna hurt 'ya. You know what I mean." (CT 766.)

"Dillon: "They just, your sisters just want you to say the truth, that's all." (CT 768.)

"Tovar: They wanna help you.
"Dillon: They're your family
"Tovar: They wanna help you.
"Dillon: They all, they all love you, but you have to say, tell us the truth about what happened." (CT 770.)

"Tovar: It's gonna help you feel better, 'cause you've got it inside right now, and you're, you're scared, and I can see it, you're scared, alright? But by hiding it doesn't fix it, doesn't make it go away, *and it doesn't help your sisters.* 'Cause right now they're hurting inside, and they're worried about you, what's gonna happen to you. Okay? But if you can't admit what's going on, and you can't tell the truth, then forever they're gonna be worried about you." (CT 770-771, emphasis added.)

"Tovar: Does it bother you that they're upset and hurt and scared for you, that they love you, but *they don't wanna see anything bad happen to you;* does that worry you?" (CT 774, emphasis added.)

"Dillon: Do you like seeing your family apart . . . ." (CT 775.)

"Tovar: They wanna support you." (CT 775.)

"Dillon: They're telling the truth. *And if you want your family back together, you're the key to the whole thing, okay?* It's on you." (CT 776, emphasis added.)

"Tovar: Let's see if somebody can settle the curiosity and, and so it doesn't happen within your family, and *we can get your*

27

*family back,* you, and you can, you can, you can end up working your family to where everybody's, everything's good again - it's a possibility. But your family's not gonna leave you if you ask for help. Your family's not gonna be upset with you if you tell them, you know, 'I did this, and I'm sorry; I won't do that.' *Your family's not gonna turn their back on you.* But if you lie and you contimu- [sic], continue doing this, your sisters, your older sisters, they're gonna be upset with you for hurting the little sisters." (CT 776, emphasis added.)

"Tovar: "You want them to feel bad? Do you wanna get through this?" (CT 777.)

"Tovar: But I don't want him [someone committing child molestation] to get in trouble." (CT 778.)

"Tovar: Make it right, *make it better for them.* I'm not telling you to lie and make something up; I wanna know the truth about what happened. *The truth is the only thing that's gonna fix all this, and keep your family together as a unit. That's the only thing that's gonna keep your family together."* (CT 780, emphasis added.)

"Dillon: But you know, I, I, I don't know what else we can tell you, but you have to tell the, the truth about that. I walked by there when I went past your mom, to go to the bathroom, and she asked, 'Is he telling you what happened?' And I said 'Yeah,' and she was real happy. I told her that you were being honest, and, and she just had a smile on her face, 'cause she wants you to tell the truth.
"Tovar: do you want us to go . . .
"Valencia: Yeah -
"Tovar: Tell her that you're telling us 'No, it didn't happen'?" (CT 782-783.)

"Tovar: Okay, well think again. 'Cause your, your future rests on this. Okay?" (CT 783.)

"Dillon: Okay, *would you rather tell us right now about what happened, or do you wanna wait 'til we go, if, if we have to go*

28

*to, after he does his report, then we go to uh, do you like going to court?"* (CT 784, emphasis added.)

"Dillon: It's scary, huh? Would you rather tell us now what happened here? Because your sisters aren't lying. We, it's, *would you rather tell us here what happened, or would you rather go to court and let them listen to your sisters tell the judge . . .*

"Valencia: Like, like -

"Dillon: Of what you, that you put your hand and touched their, their private part - what would you rather do? Would you rather tell us here?

"Valencia: Tell the truth here.

"Dillon: Okay, because it's other, other people that are there, strangers, and its embarrassing, but we're not gonna look at you; *we wanna help you.*" (CT 785, emphasis added.)

Dillon: "It's better, we're trying to get you to tell us here, *rather than going to court,* and then your sisters tell you, say this in front of strangers, the judge, other people there in court." (CT 785, emphasis added.)

Dillon: "So right now is the time to tell us, rather than having it go that far. I know you don't wanna see your sisters get up there and say things like that, or people look at the recording of what they said that you did. That's why it's important, that's why we have you here to talk to you about it, so you can tell us here, *so that your poor sisters don't have to go through that,* and you don't have to go through it either, be embarrassed about it." (CT 785-786, emphasis added.)

"Tovar: Well, you need to start talkin' about this, because *you're limiting our options.* There's not a whole lot I can do." (CT 790, emphasis added.)

"Dillon: You know, you're their brother. *They don't wanna see anything bad happen to you,* and they don't want you to touch them anymore, they don't want you touching other people. *But they, they don't wanna see you get hurt."* (CT 795, emphasis added.)

29

"Tovar: Did you touch her right here when you're, when you're wrestling and you go like that with your hand? And be honest with me - here you were already tell us, 'Yeah, I did this, I did that,' and you add to it. *We're trying to help you; we're not trying to get you in trouble."* (CT 799, emphasis added.)

"Tovar: Carly, Karely, or Carly-right now, than have to to go to court and have her-how would you feel having her say that in front of other people, the judge, and, and, and all that, and you're there?" (CT 803-804.)

"Tovar: I don't know what else to tell you. Like he said, he's getting a little upset with everything, and we, *we can only help you so much.*
"Dillon: *He doesn't want help."* (CT 807, emphasis added.)

"Tovar: *We're trying to make you tell us now, than to go over there in front of the judges* and uh, strangers, and, and have your sisters tell them what you did, that you touched their front part one time." (CT 808, emphasis added.)

"Tovar: "All we wanna do is get your family back together, but you gotta tell us. I know that you wanna tell us, but you just, you're that close. But then we, if you don't say anything, we're not gonna make you say things that aren't true, *but then we can't help you anymore.* Okay? So tell us about when you touched her private part that one time." (CT 809, emphasis added.)

"Dillon: But if that's what you wanna do, then we'll just write up what they said and take it over to the D.A. and let them, let them deal with it in court.

"Tovar: It's all we can do. I mean, *I can't help you any more."* (CT 811, emphasis added.)

Following the foregoing browbeating, appellant finally broke down

and incriminated himself. Appellant admitted that he had molested Karely on

30

three separate occasions. (CT 815, 820-821, 831, 833.) Appellant also wrote letters of apology to Karely and Laura in which he intimated that he had touched their private parts. (People's Exhibits 12 and 13.)

Appellant will not belabor what is plainly obvious from the voluminous and detailed quotations from the record. The police violated due process by offering appellant a stark alternative: If he confessed, the police would "help" him and his family unit would be restored. If he did not confess, he would be arrested and his sisters would be compelled to testify in court. These threats and promises rendered appellant's statements inadmissible. This conclusion is compelled by four California Supreme Court cases.

In *People v. Hogan,* supra, 31 Cal.3d 815, the police interrogated the defendant about his involvement in a homicide. During the course of three separate interviews, the police twice told the defendant that they would try to "help" him if the crime was caused by his mental problem. (*Id.* at pp. 835, 838.) In addition, the police falsely told the defendant that there were eyewitnesses who had implicated him. On this record, four members of the Supreme Court concluded that the defendant's confession was inadmissible due to the combined effect of the offer of "help" and the lie concerning the existence of eyewitnesses. (*Hogan*, supra, 31 Cal.31 at pp. 838-843 (plurality opn. of Bird, C.J.); pp. 855-859 (conc. opn. of Kaus, J.); but see *People v.*

31

*Thompson,* supra, 50 Cal.3d 134, 167 [holding in *Hogan* "was ultimately grounded upon the police promise to obtain help for Hogan if he confessed . . . ."].)

If anything, the case at bar is far more egregious than *Hogan.* Here, the police relentlessly suggested to appellant that he would not have to go to court if he confessed. (CT 665, 685, 687, 717, 784-786, 803-804, 808, 811.) Obviously, this was a manifest lie. The police fully intended to arrest appellant if he confessed. Moreover, as in *Hogan*, the police made a false promise that they would "help" appellant if he confessed. Indeed, the false promise was made four separate times. (CT 785, 799, 807, 811.) This well calculated lie rendered appellant's statement involuntary since it "clearly implied an advantage to appellant if he talked . . . ." (*Hogan*, supra, 31 Cal.3d at p. 838.)

*People v. Neal*, supra, 31 Cal.4th 63 is also similar to the instant case. There, a detective told the defendant that he would take him to Timbuktu if he did not talk but would do the "best" he could for him if he cooperated. (*Id*. at p. 73.) In finding that this comment was coercive, the court held that the detective had improperly combined a threat (a trip to Timbuktu) with a promise of leniency (doing what he could). (*Id*. at pp. 84-85.)

In our case, the police went far beyond the single comment made in

32

*Neal.* Here, the police spent two hours and twenty minutes during which they alternately held out the promise of family reunification, a lack of court proceedings and "help"if appellant confessed and the contrasting doom of a trial where appellant's sisters would have to testify if he did not confess. This combination of promises and threats was terminally "corrosive of voluntariness. [Citations.]" (*Neal*, supra, 31 Cal.4th 63, 84.)

*People v. Trout* (1960) 54 Cal.2d 576[1] also bears close resemblance to the instant case. In *Trout*, the police brought the defendant and his wife to the police station.    During their interrogation, the police implied that the defendant's wife would be released if he confessed.    The court held that the defendant's "confession resulted from the improper pressure by the police and should not have been received in evidence.    [Citation.]" (*Id*. at p. 585.)

Once again, our record cannot be meaningfully distinguished.  Here, the police expressly and repeatedly told appellant that his sisters would not have to testify if he confessed.    As in *Trout*, this was an impermissible promise of a family benefit.

Finally, *People v. Gonzales* (1902) 136 Cal. 666 is closely on point. There, the sheriff told the defendant that he "'would do whatever he could for'" him if he talked.  (*Id*. at p. 667.)  The court held that the promise was an improper inducement which rendered the defendant's statement inadmissible.

---

1.    *Trout* was overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509, fn. 17.

33

(*Id*. at p. 668.)

Here, the improper inducement was far more specific than it was in *Gonzales.* Rather than a generalized promise to do "whatever" they could, the instant detectives repeatedly suggested that appellant would avoid trial and enjoy a reunited family if he confessed. Plainly, these promises rendered appellant's statement inadmissible.

Notwithstanding the cited cases, appellant anticipates that the People will contend that the detectives did no wrong since they merely beseeched him to "tell the truth." This contention will no doubt be premised on the principle that it is permissible for the police to encourage a suspect to tell the truth. (*People v. Holloway* (2004) 33 Cal.4th 96, 115.) This rule does not help the People here.

As has already been explored above, the instant detectives went far beyond the mere exhortation to tell the truth. Instead, the detectives promised benefits and made threats. Simply stated, the detectives went far over the line.

As a final point, it cannot be overlooked that appellant was only 20 years old at the time of the interrogation and was a Mexican national who had not completed high school and had no experience with the criminal justice system. (CT 1070.) Given appellant's youth and lack of sophistication and experience, the conclusion is compelled that his will was overborne by the

34

police misconduct. (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 209 [accused's age, sophistication and experience are factors to be considered].)

Having established that the police acted impermissibly, the next question is whether the police misconduct was the motivating cause of appellant's confession. (*People v. Benson* (1990) 52 Cal.3d 754, 778-779.) There is no doubt that it was in this case.

Shortly before he broke down and confessed, appellant told the detectives that he wanted to tell the truth since he did not "wanna go to court." (CT 798.) Then, in the midst of confessing, appellant again indicated that he wanted to admit his wrongdoing "because I don't want to go to court (inaudible.)" (CT 824.)

As the quoted comments reveal, appellant was motivated to confess by the very promise made by the police (i.e. he would not have to go to court if he confessed). Thus, appellant's confession was subject to suppression. (*People v. Vasila* (1995) 38 Cal.App.4th 865, 876 [promise to preclude federal prosecution "catered to defendant's primary motivation" and rendered his statement inadmissible].)

As always, the ultimate question is whether defense counsel's failure to obtain exclusion of appellant's statements was prejudicial. In answering this question, this court must determine whether "there is a reasonable

35

probability" that appellant would have been acquitted absent the error. (*Strickland v. Washington*, supra, 466 U.S. 668, 694.) Without doubt, there is such a probability in this case. This is so for a number of reasons.

The primary and most compelling reason is that a "confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296.) Given the nature of this type of evidence, the erroneous admission of a confession carries a "'profound impact on the jury . . . .'" (*Ibid.*)

In this case, appellant essentially confessed to the commission of three separate lewd touchings against Karely. (CT 815, 820-821, 831, 833.) By appellant's own admission, one of the touchings was of Karely's vagina under her clothes. (CT 831, 833.) The touching lasted for three or four minutes. (CT 831.) Plainly, this evidence could only have had a "profound" and determinative impact on the jury.

Admission of appellant's confession must be deemed prejudicial as to all counts. While appellant's admissions involved only a single complainant, it is unreasonable to believe that the jury segregated his admissions in that manner. Given the incendiary nature of the admission that appellant had touched Karely's vagina for several minutes, reversal as to all counts is

36

required.  Analogous authority supports this result.

The Supreme Court has repeatedly held that the improper admission of

prior acts of child molestation is so prejudicial as to mandate reversal.

(*People v. Alcala* (1984) 36 Cal.3d 604, 636; *People v. Thomas* (1978) 20

Cal.3d 457, 470.)  By parity of reasoning, it follows that the erroneous

admission of appellant's partial confession must be deemed prejudicial as to

all counts.  This is so since the admission of appellant's confession is far more

damaging than extrinsic proof of acts of molestation offered by other

witnesses.  (*Arizona v. Fulminante,* supra, 499 U.S. 279, 296.)

Aside from the powerful impact of the confession, it is essential to note

that appellant's statement served to shore up what was a less than

overwhelming case for the government.  The family life of the complainants

was quite messy and it was less than clear whether their older sister, Norma,

had actually been molested by her natural father or whether she had fabricated

her claim in this regard.  In either case, Laura was on notice that the mere

utterance of such a charge would gain the attention of the authorities.  Given

the rather prompt recantation by all three complainants, the People did not

have an easy task in presenting their case.

Given the weakness in his case, the prosecutor made sure to amply

mention appellant's oral and written admissions during his closing argument.

37

(RT 1015, 1019, 1023-1027, 1046-1047, 1065.) These references demonstrate the prejudice flowing from admission of appellant's statements. (*People v. Cruz* (1964) 61 Cal.2d 861, 868 ["[t]here is no reason why we should treat this evidence as any less 'crucial' than the prosecutor - and so presumably the jury - treated it."]; see also *People v. Woodard* (1979) 23 Cal.3d 329, 341 [reversal ordered where the prosecutor "exploited" erroneously admitted evidence during his closing argument.].)

Finally, the record also contains two other objective indications that the People's case was a troubled one. At appellant's first trial, the jury hung and was unable to return any convictions. (CT 314.) In addition, the instant jury deliberated for eight hours before rendering its verdicts. (CT 1020-1021, 1049.) Plainly, the case was a close one. (*People v. Brooks* (1979) 88 Cal.App.3d 180, 188 [prior hung jury shows that People's case was less than overwhelming]; *People v. Cardenas* (1982) 31 Cal.3d 897, 907 [six hours of deliberations is evidence of a close case].)

In short, the jury may well have acquitted appellant had his incriminating statements been excluded. Reversal is required since this court can have no certainty that the error was harmless. (*Strickland v. Washington*, supra, 466 U.S. 668, 694 [counsel's error must be deemed prejudicial when the reviewing court lacks "confidence" in the result reached at trial].)

38

II.

APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS WHEN HIS TRIAL ATTORNEY FAILED TO OBJECT TO THE EVIDENCE THAT KARELY SAW LAURA LEAVE APPELLANT'S ROOM WITH A "RED STAIN" ON HER CLOTHES. ALTERNATIVELY, APPELLANT PERFORMED INEFFECTIVELY WHEN HE FAILED TO REQUEST CALJIC NOS. 2.50.1 AND 2.50.2.

In her interview with the police, Laura recalled an incident in which she had consumed six beers and spent the night in appellant's room. (CT 511-512.) According to Laura, appellant made no sexual advance towards her. (CT 512.)

When she was interviewed by the police, Karely also indicated that Laura had spent the night in appellant's room. (CT 487.) With respect to Laura's appearance on the following morning, Karely gave a less than coherent statement:

"Torres      Okay. What did Laura tell you what happened? Did you tell, did Laura tell you why she's in her, in Jesus's room?

"Karely Doe No, she didn't, I didn't ask her nothing. But the shirt that she has right now, it was uh, all red. And she had a red pants, I think umm, she had, I don't know, but it was all ho-, red over here, her shirt that she has right now.

"Torres      Uh-huh.

39

"Karely Doe  It was all red, like-

"Torres        Red who, red from what?

"Karely Doe  I don't know, I think it was for the pants that she
               put something, and then she was like, sleeping in
               her pants, I think.

"Torres        Somethin' spilled?

"Karely Doe  I think, I don't know, I'm not sure.

"Torres        Okay.  But her shirt's stained?

"Karely Doe  Yeah."  (CT 490.)

Subsequently, the prosecutor brought up this point at trial.  Karely

admitted that she had told the police that she saw a "red stain" on both Laura's

pants and shirt.  (RT 96.)  However, Karely denied that she had actually seen

any stains.  (RT 96-97.)

Given this evidence, the prosecutor twice suggested to the jury that

Laura had blood on her clothes and appellant had had sexual intercourse with

her.  (RT 1022, 1071-1072.)  However, in making this argument, the

prosecutor was honest enough to recognize that Karely's testimony did not

actually prove that such an act had occurred.

> "Something happened when she was drunk, doesn't
> remember, or she doesn't want to talk about it, something
> happened, and we know that something might have happened,
> because we hear Karely describing a rather odd circumstance
> during her interview with Officer Torres, Karely sees Laura
> coming out of the defendant's room one morning with a red

40

stain on her pants and a red stain on her shirt.

"There's no suggestion from Laura or from Karely that Karely is well versed in the ways of what might have happen to a girl when she's sexually penetrated for the first time or for that matter, she has intercourse when she's on her period.

"Karely is 9 years old.

*"We don't have proof that there was intercourse on that day, that's why we haven't charged it,* but I submit to you, ladies and gentlemen, there's enough evidence out there to lead you to believe that a whole lot more is going on here, a whole lot more." (RT 1022, emphasis added.)

"They told the truth best they could given all the limitations that attach to this as far as telling details as well when Karely says that we felt dirty, so we took a shower, and Karely talks about seeing Laura with blood on her shirt and on her pants during her interview, I believe it's with Detective Dillon.

"I take that back, I think, that's a prior statement, the interview with the officer at the scene, that would be Officer Solis, she mentioned seeing blood on the shirt and the shorts.

"That's not something the kid is going to make up, a 9 year-old, because she doesn't see it as anything significant.

"She doesn't say, no, I know he was in there having sex, because I saw the blood.

"She just was relating what she sees, a 9-year-old girl late at night and she's scared and doesn't know who she's talking to." (RT 1071-1072.)

Defense counsel made no objection to admission of the "stain" evidence nor did he request any jury instruction as to how the jury was to

41

evaluate the evidence. For the reasons which follow, it is manifest that
counsel's omissions constitute the ineffective assistance of counsel.

A.    The Evidence Should Have Been Excluded As
      Irrelevant.

In his closing argument, the prosecutor forthrightly told the jury that
Karely's pretrial statement was insufficient to prove beyond a reasonable
doubt that sexual intercourse had occurred. (RT 1022.) Nonetheless, the
prosecutor urged the jury to draw this very conclusion. (RT 1022, 1071-
1072.) However, had defense counsel acted properly, the evidence would
have been excluded on relevancy grounds.

Pursuant to Evidence Code section 210, relevant evidence is that
evidence which has a "tendency in reason to prove or disprove any disputed
fact that is of consequence to the determination of the action." Pursuant to
this definition, evidence is admissible "if it 'tends "logically, naturally, and by
reasonable inference" to establish material facts'" which are at issue. (*People
v. Morrison* (2004) 34 Cal.4th 698, 711.) However, evidence is irrelevant "if
it leads only to speculative inferences. [Citation.]" (*Ibid.*) In this case,
Karely's pretrial statement was inadmissible since it could only lead to
speculative inferences.

Viewed in its full context, the record shows that Laura spent the night
in appellant's room. However, even in her pretrial statement in which she

42

offered incriminating evidence against appellant, Laura denied that there was

any sexual contact on the night in question. Nonetheless, the prosecutor asked

the jury to draw the inference that there had been sexual intercourse since

Karely saw a "red stain" on Laura's clothing. This inference cannot be

reasonably drawn. This is so for two reasons.

First, although the prosecutor told the jury that Laura had "blood" on

her clothes (RT 1071-1072), Karely did not so state. Rather, she said that she

saw a red stain. (CT 490, RT 96-97.) Obviously, a red stain might be caused

by any number of liquids other than blood. (See *Miller v. Pate* (1967) 386

U.S. 1, 6-7 [judgment reversed where the prosecutor falsely told the jury that

paint stained shorts actually contained blood].)

Second, even if it is assumed that the red stain was blood, this fact does

not yield the reasonable inference that appellant engaged in sexual intercourse

with Laura. In this regard, the blood could have been the result of fisticuffs

or menstruation. Thus, it is nothing but speculation to say that the existence

of blood proves an act of sexual intercourse.

Although it is somewhat of a different case, *People v. De La Plane*

(1979) 88 Cal.App.3d 223[2]/ establishes the merit of this conclusion. There,

---

2.    *De La Plane* was disapproved on other grounds in *People v. Green*
      (1980) 27 Cal.3d 1, 39, fn. 25.

43

the defendant was charged with murdering Kevin. The defense theory of the

case was that George Stefani had killed Kevin. In support of this theory, the

defense sought to adduce evidence that the defendant's car was destroyed and

the homes of both the defendant and his lawyer were burglarized after Stefani

had threatened the lawyer following his receipt of a subpoena issued by the

lawyer. In holding that the evidence was properly excluded as irrelevant, the

late Justice Bernard Jefferson reasoned as follows:

> "The evidence, however, that Stefani had burglarized the
> premises of defendant and defense counsel and had destroyed
> the automobile of defendant because Stefani had been
> subpoenaed by the defense to testify in the current case could
> have no tendency in reason to establish that Stefani was the
> perpetrator of the Kevin murder. Any inference from evidence
> of the burglaries and malicious destruction of an automobile to
> the fact that Stefani was the perpetrator of the Kevin murder
> would be clearly speculative and lacking in trustworthiness or
> reliability based on either logic or experience." (*Id.* at pp. 243-
> 244.)

The same reasoning applies here. As in *De La Plane,* the foundational

fact (i.e. a red stain on Laura's clothes) simply does not lead to the logical

conclusion that she was the victim of sexual intercourse. Given the other

reasonable explanations for the "red stain," the inference that a sex act had

occurred was "clearly speculative and lacking in trustworthiness . . . ." (*De*

*La Plane,* supra, 88 Cal.App.3d at p. 244.)

In short, the record establishes that Karely's pretrial statement

44

constitutes irrelevant evidence. Defense counsel erred by failing to render a
relevancy objection. (*In re Jones,* supra, 13 Cal.4th 552, 581 [defense counsel
has duty to seek exclusion of prejudicial evidence].)

    B.    <u>Assuming Arguendo That The Evidence Was
Marginally Relevant, It Should Have Been
Excluded Pursuant To Evidence Code Section
352.</u>

Pursuant to Evidence Code section 352, a trial court has the authority
to exclude relevant evidence if the probative value of the evidence is
"substantially outweighed" by its prejudicial effect. In this case, the trial court
would have sustained a section 352 objection had one been made by defense
counsel.

As has been discussed above, the probative value of the evidence was
close to nil since the existence of the "red stain" did not establish that
appellant had sexual intercourse with Laura. However, the prejudicial effect
of the evidence was enormous. Indeed, the prosecutor fanned the flames of
prejudice when he suggested to the jury that appellant might have "sexually
penetrated [Laura] for the first time or for that matter, she has intercourse
when she's on her period." (RT 1022.) Insofar as this comment could only
have caused the jury to view appellant as an evil child rapist, it is manifest that
the "red stain" evidence was excludable under section 352.

*People v. Harris* (1998) 60 Cal.App.4th 727 supports this conclusion.

45

In *Harris*, the defendant was charged with committing sex acts against patients in a mental health center. Pursuant to Evidence Code section 1108, the prosecutor sought to introduce evidence of a prior rape committed by the defendant in which the victim's vagina and mouth were left bloody. Given the dramatic facts of the prior incident, the Court of Appeal held that the evidence should have been excluded under section 352.

> "The evidence did little more than show defendant was a violent sex offender. The evidence that defendant committed a violent rape of a stranger, as the jury was led to believe, did not bolster the [present complainants'] credibility nor detract from the evidence impeaching their stories." (*Harris*, supra, 60 Cal.App.4th at p. 740.)

The case at bar provides an even better case than *Harris* for the application of section 352. In *Harris*, even though it was undisputed that the defendant had committed a "violent rape," the evidence was deemed too prejudicial for admission. Here, it is doubtful that sexual intercourse even occurred. Thus, when the weakness of the evidence and its highly prejudicial effect are considered together, the conclusion is compelled that the court would have sustained a section 352 objection had one been made. Defense counsel erred by failing to make the objection. (*In re Jones,* supra, 13 Cal.4th 552, 581.)

## C.    Defense Counsel Erred By Failing To Request That CALJIC Nos. 2.50.1 And 2.50.2 Be Given.

Assuming arguendo that appellant's relevancy and section 352

46

objections would have failed, trial counsel also erred by neglecting to request that CALJIC Nos. 2.50.1 and 2.50.2 be given. Had these instructions been read to the jury, Karely's pretrial statement would have been disregarded by the jury.

As the prosecutor made clear in his closing argument, he adduced the "red stain" evidence for the purpose of suggesting that appellant had sexual intercourse with Laura. (RT 1022.) Given this theory of admissibility, Karely's pretrial statement was a species of "other crimes" evidence. On this record, defense counsel made a serious error when he failed to request CALJIC Nos. 2.50.1 and 2.50.2.

In relevant part, No. 2.50.1 advises the jury that it may not consider an uncharged criminal act unless a preliminary determination is made that the act has been proved by a preponderance of the evidence. In turn, No. 2.50.2 sets forth the definition of preponderance of the evidence. In this case, the omission to request Nos. 2.50.1 and 2.50.2 was highly detrimental to appellant's cause.

Tellingly, the prosecutor conceded in his closing argument that he could not satisfy the beyond a reasonable doubt standard with respect to the uncharged act. (RT 1022.) Given this concession, it is apparent that there is a substantial likelihood that the jury would not have found that the

preponderance of the evidence standard was satisfied either.

As appellant has argued above, the fact that Laura's clothing bore a red stain had, at best, a speculative tendency to prove that she had sex with appellant. Given the weakness of the inference advanced by the prosecutor, it is virtually certain that the jury would have found a lack of convincing evidence that a sex act had occurred if proper instructions had been given. Thus, defense counsel erred by failing to request Nos. 2.50.1 and 2.50.2. (See *People v. Simon* (1986) 184 Cal.App.3d 125, 134 [where it was unclear that the defendant's prior assault had any probative value, the trial court was required to instruct the jury that it could not consider the evidence unless its materiality had been proved by a preponderance of the evidence].)

D.   Appellant Was Severely Prejudiced By Admission Of The "Red Stain" Evidence.

It is appellant's burden to establish that it is reasonably probable that he would have been acquitted absent admission of the evidence. (*Strickland v. Washington,* supra, 466 U.S. 668, 694.) Without doubt, the error is prejudicial.

The evidence was inflammatory. Although the prosecutor used somewhat benign language in arguing the evidence, the point that he made was a vivid one: Appellant was an evil and brutal man who had stolen his own sister's virginity by forcibly penetrating her and causing significant bleeding.

48

(RT 1022, 1071-1072.)  It is difficult to imagine evidence that is more prejudicial in a child molestation case.

Should there be any doubt on this point, *People v. Harris,* supra, 60 Cal.App.4th 727 will lay it to rest.  There, the jury heard inadmissible evidence that the defendant had raped a woman and caused her to bleed from her vagina.  Since the case was a closely contested one, reversal was required due to "the critical and unfairly prejudicial nature of [the] evidence . . . ."  (*Id.* at p. 741.)

Here, the same situation is presented.  We know that the case was a close one since the first jury hung and the instant jury deliberated for eight hours.  Insofar as appellant's sisters recanted their allegations and offered plausible explanations as to why they had originally lied, it is manifest that the People's case was less than overwhelming.  Given the highly inflammatory nature of the "red stain" evidence, the judgment must be reversed.  (*Harris,* supra, 60 Cal.App.4th at p. 741.)

///

///

///

///

///

49

III.

APPELLANT WAS DEPRIVED OF THE EFFECTIVE
ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS WHEN HIS TRIAL
ATTORNEY FAILED TO MOVE FOR THE EXCLUSION
OF THE HIGHLY PREJUDICIAL EVIDENCE THAT HE
USED DRUGS AND FOUGHT WITH THE POLICE.

In her pretrial interview with the police, Laura provided two highly

prejudicial pieces of information concerning appellant. First, Laura told the

police that her parents were spying on appellant since they believed that he

took drugs. (CT 516.) Second, Laura asserted that appellant had previously

fought with the police. (CT 597.) Without doubt, defense counsel erred when

he failed to object to these irrelevant and prejudicial pieces of evidence.

As has been discussed above, one of defense counsel's primary duties

is to seek the exclusion of "evidence that is more prejudicial than probative

. . . ." (*In re Jones,* supra, 13 Cal.4th 552, 581.) In this case, defense counsel

absolutely dropped the ball by failing to make appropriate evidentiary

objections.

As is well settled, a defendant's use of drugs is irrelevant and

inadmissible when the usage has no bearing on the crimes charged. (*People

v. Cardenas*, supra, 31 Cal.3d 897, 906.) In this case, there was absolutely no

connection between the alleged offenses and the fear of appellant's parents

that he was using drugs. Thus, had defense counsel made a relevancy

50

objection, the evidence would have been excluded.

The same holds true for the evidence that appellant fought with the police. As is the case with appellant's purported drug use, his propensity to fight with the police had no relevance to the charged offenses. Thus, once again, the evidence would have been excluded had a relevancy objection been advanced. (*People v. Sam* (1969) 71 Cal.2d 194, 205-206; *People v. Deeney* (1983) 145 Cal.App.3d 647, 654-657.)

The remaining question is whether the admission of the evidence was prejudicial. In appellant's view, there is a reasonable probability that the evidence prejudiced his cause. (*Strickland v. Washington,* supra, 466 U.S. 668, 694.)

With respect to the drug evidence, the Supreme Court has cautioned that this type of evidence has a "'catastrophic'" impact on the jury. (*In re Jones,* supra, 13 Cal.4th 552, 577.) This is so because "the general public 'has been taught to loathe those who have anything to do with illegal narcotics in any form or to any extent.'" (*Id.* at pp. 577-578.)

Appellant anticipates that the People will contend that the prejudicial impact of the evidence was mild since drugs were mentioned only a single time and only in the context that appellant's parents believed that he was using drugs. (CT 516.) However, this line of argument cannot save the day for the

51

People.

In *People v. Davis* (1965) 233 Cal.App.2d 156, the People adduced the opinion of a police officer that the defendant was under the influence of narcotics when he was arrested. Notwithstanding this single piece of evidence regarding the defendant's use of drugs, the court found prejudicial error since the effect of the evidence was to brand the defendant "as a habitual lawbreaker, a loathsome, unworthy person, predisposed to rob or steal to support his habit." (*Id*. at p. 162; accord; *In re Jones,* supra, 13 Cal.4th 551, 577-578.)

The same is true here. Although the jurors heard only a single reference concerning appellant's drug use, they undoubtedly drew the inference that he was a person of low character. Prejudice must be found. (*Davis*, supra, 233 Cal.App.2d 156, 162.)

The identical conclusion is warranted regarding the evidence that appellant fought with the police. As the Supreme Court has indicated, evidence of a defendant's propensity to act violently is "prejudicial and inflammatory" since it yields the impression that the defendant is an "antisocial individual of generally bad character, an immoral person unworthy of the jury's belief or consideration." (*People v. Sam*, supra, 71 Cal.2d 194, 206; accord, *People v. Deeney,* supra, 145 Cal.App.3d 647, 656-657.) Indeed,

in this case, the prejudicial evidence was of a special character since it demonstrated that appellant lacked respect for the police. Given the reality that the police are an idolized group in our society, it was all the more prejudicial that the jury learned of appellant's propensity to fight with the protectors of public order.

Finally, if this court should hold that neither of counsel's two errors is individually prejudicial, reversal is nonetheless required since the errors are cumulatively prejudicial. (*In re Jones,* supra, 13 Cal.4th 552, 583.) In this regard, counsel's omissions allowed the jury to learn that appellant was a drug user with a propensity to fight with the police. Insofar as this evidence allowed the jury to conclude that appellant was an antisocial and potentially dangerous man, reversal is required. (*Jones*, supra, 13 Cal.4th 552, 583-588 [capital murder conviction reversed due to the cumulative prejudice flowing from defense counsel's several errors].)

IV.

## THE ENTIRE JUDGMENT MUST BE REVERSED DUE TO THE CUMULATIVE PREJUDICE FLOWING FROM THE THREE ERRORS IDENTIFIED ABOVE.

Assuming that this court should conclude that none of the three errors identified above individually warrants reversal, the cumulation of the errors compels a finding of prejudice. (*People v. Hill* (1998) 17 Cal.4th 800, 844.)

53

In establishing this conclusion, it is helpful to compare the trial which actually took place with the one which should have occurred.

Had the case been properly litigated, the jury would not have heard three critical and highly negative pieces of information: (1) appellant confessed to three acts of molestation; (2) appellant may have had sexual intercourse with Laura; and (3) appellant fought with the police and may have taken drugs. Obviously, this evidence was highly prejudicial in nature and painted appellant as an evil and dangerous person.

Absent the inadmissible evidence, the jury would have been left with a factually close case as to whether appellant had molested his sisters. Given the dysfunctional family life which included an older sibling who may have falsely asserted that she was molested by her father, it is reasonable to conclude that the jury would have acquitted appellant absent his counsel's several errors. Reversal is required. (*People v. Hill*, supra, 17 Cal.4th 800, 844-848 [capital murder conviction reversed due to cumulative prejudice flowing from several errors].)

///

///

///

///

V.

THE PENAL CODE SECTION 288.5 CONVICTION
INVOLVING DENISSE MUST BE REVERSED SINCE
APPELLANT WAS DEPRIVED OF THE EFFECTIVE
ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS WHEN HIS ATTORNEY
FAILED TO RENDER A LACK OF PERSONAL
KNOWLEDGE OBJECTION TO ADMISSION OF LAURA'S
HEARSAY STATEMENT THAT APPELLANT HAD BEEN
MOLESTING DENISSE SINCE SHE WAS FOUR YEARS
OLD.

In count one, appellant was charged with the continuous sexual abuse
of Denisse within the meaning of Penal Code section 288.5. (CT 409.) One
of the elements of section 288.5 is that the perpetrator must have molested the
victim for a period "not less than three months in duration . . . ." (Penal Code
section 288.5, subd. (a).) In their attempt to prove the three month element of
the crime, the People relied on a single piece of evidence.

Rosalie Correa was employed at Laura's school. In August 2004,
Laura told Ms. Correa that appellant had been molesting her sisters. (RT
414.) Ms. Correa recalled that Laura told her that appellant had been
molesting Denisse "since she was 4 years old." (RT 414.) Defense counsel
registered no objection to this testimony.

Laura's statement constituted substantial evidence in support of the
three month element of section 288.5 since the record otherwise establishes
that Denisse was eight years old in July 2004 and appellant had molested her

55

within days of his July 16, 2004 arrest. (RT 14, CT 443, 450, 447-448, 880-

882.) Given this other evidence, the prosecutor twice told the jury that the

three month element was proved by Ms. Correa's testimony.

> "There's Rosie Correa's testimony in which Laura said
> that the defendant has been molesting Denisse since she was 4
> years old.
> "That's pretty clear that molestation has been going on
> for more than three months as is required to convict under this
> count." (RT 1009.)

> "In each count, 1 and 6, we are required to prove the
> molestation occurred for three months, and I submit to you,
> there is sufficient evidence for that.
> "Certainly, we've got, for instance, Karely's statement in
> her interview with Officer Solis that the allegation in count 7,
> her pants are being pulled down in her mother's bedroom, the
> touching that occurred, when she was in first or second grade,
> and which are more consistent, and the third grade, and she
> talks to Officer Solis, so obviously we got a span of time of one
> or several years with regard to Karely.
> "With regard to Denisse, you remember here Rosalie
> Correa testified that Laura said that Denisse had been
> complaining about being touched since she was 4 years old.
> "We know that Denisse is 8 at the time she makes her
> report to the police." (RT 1066-1067.)

Without doubt, appellant was deprived of the effective assistance of

counsel when his attorney failed to object to Ms. Correa's testimony. Had

counsel done so, there would have been insufficient evidence to prove the

section 288.5 count regarding Denisse.

At the outset, it is, of course, the rule that defense counsel has the duty

to make appropriate evidentiary objections which will defeat the government's

56

case. (*In re Jones,* supra, 13 Cal.4th 552, 581.) Here, a meritorious objection was available.

In her pretrial statement to the police, Laura indicated that she had never seen appellant molest her sisters. (CT 500, 641.) While Laura indicated that Denisse had told her that appellant had molested her, Laura never specified the dates on which Denisse had been molested. (CT 498-501.) Indeed, Laura specifically stated that she did not know when the acts had occurred. (CT 500.) All that Laura knew was that the acts had occurred recently. (CT 500-501.)

Given this record, Laura's statement to Ms. Correa was inadmissible under Evidence Code section 702. In material part, section 702 provides that "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter." Here, it is readily apparent that Laura lacked any personal knowledge that Denisse had been molested since she was four. Absent such knowledge, her hearsay statement to Ms. Correa was inadmissible.

*People v. Daniels* (1991) 52 Cal.3d 815 illustrates the merit of this conclusion. There, the defendant sought to prove that Cornish was a drug dealer. The defendant called Pinkney who testified outside the presence of the jury that he had talked to Cornish about his use of drugs and had heard that

57

Cornish was borrowing money. Pinkney also testified that he saw Cornish

give packages to people at work. Given the fact that other evidence had been

adduced which showed that Cornish was involved in drug transactions, the

defense argued that Pinkney should be allowed to testify that Cornish sold

drugs in the workplace. The Supreme Court held that the People's lack of

personal knowledge objection was properly sustained.

> "Whether Cornish was in fact involved with cocaine at other
> times, or indeed sold cocaine at work, has no bearing on
> whether Pinkney *had personal knowledge* that Cornish sold
> drugs at work, even if Cornish did in fact deal drugs at work,
> Pinkney did not necessarily have personal knowledge of such
> activity.    Defendant essentially contends that personal
> knowledge can be inferred through hindsight. But 'proof of
> personal knowledge must be shown *first*, once a party has made
> an objection that the proffered witness lacks personal
> knowledge of the facts to which he proposes to testify.'
> [Citation.] The trial court did not err by denying Pinkney's
> testimony for lack of personal knowledge." (*Daniels,* supra, 52
> Cal.3d at p. 862, emphasis in original.)

In light of the analysis in *Daniels*, a meritorious lack of personal

knowledge objection should have been made in this case. As has been shown

above, Laura never saw Denisse being molested nor did Denisse ever tell her

that she had been molested other than recently.  (CT 500-501, 641.)  Given

this record, there was no factual basis for the asserted conclusion that Denisse

had been molested since she was four. As in *Daniels*, the conclusion was not

within the declarant's personal knowledge. (*Daniels*, supra, 52 Cal.3d at p.

862.)

The remaining question is whether counsel's error is prejudicial. (*Strickland v. Washington,* supra, 466 U.S. 668, 694.) It was.

As was discussed above, the prosecutor argued to the jury that the three month element of the crime was established by Laura's hearsay statement to Ms. Correa. (RT 1009, 1066-1067.) Insofar as the statement should have been excluded, the remaining evidence does not prove the element. The section 288.5 conviction regarding Denisse must be reversed.

## CONCLUSION

For the reasons expressed above, the judgment should be reversed in its entirety. In the alternative and at the very least, the conviction in count one must be reversed.

Dated: March 10, 2006                    Respectfully submitted,

DALLAS SACHER
Attorney for Appellant,
Jesus Valencia

59

## CERTIFICATE OF COUNSEL

I certify that this brief contains 13306 words.

Dated: March 10, 2006

Dallas Sacher

DALLAS SACHER
Attorney for Appellant,
Jesus Valencia

## Rule 33(d)(2) Statement

Appellant has requested in writing that this brief not be sent to him. I

have advised appellant of the nature of the brief and its general contents.

Dated: March 10 , 2006

DALLAS SACHER
Attorney for Appellant,
Jesus Valencia

61

## PROOF OF SERVICE

I declare that I am over the age of 18, not a party to this action and my business address is 100 N. Winchester Blvd., Suite 310, Santa Clara, California 95050.   On the date shown below, I served the within **APPELLANT'S OPENING BRIEF** to the following parties hereinafter named by:

 X      Placing a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at Santa Clara, California, addressed as follows:

Attorney General's Office
455 Golden Gate Avenue
Suite 11,000
San Francisco, CA 94102-7004
[Attorney for Respondent]

District Attorney's Office
70 W. Hedding Street
San Jose, CA 95110

Clerk of the Superior Court
191 N First Street
San Jose, CA 95113

Maria Villanueva
3040 Bradshaw Drive
San Jose, CA 95148

Cary Lindstrom, Esq.
65 E. Taylor Street
San Jose, CA 95112

I declare under penalty of perjury the foregoing is true and correct.  Executed this _10th_ day of March, 2006, at Santa Clara, California.

Priscilla A. O'Harra

62

# ATTACHMENT C

COPY



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

In re JESUS VALENCIA,

    on Habeas Corpus.

H030530
(Santa Clara County
 Super. Ct. No. CC460324)

**Court of Appeal - Sixth App. Dist.**
**FILED**

DEC 2 6 2006

MICHAEL J. YERLY, Clerk

By_____
             DEPUTY

BY THE COURT:

    The petition for writ of habeas corpus is denied.

    (Mihara, Acting P.J., McAdams, J., Duffy J. participated in this decision.)

Dated   **DEC 2 6 2006**       **MIHARA, J.**   Acting P.J.

RECEIVED

DEC 2 6 2006

S·D·A·P

# ATTACHMENT D

Court of Appeal, Sixth Appellate District - No. H030530
**S149931**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JESUS VALENCIA on Habeas Corpus

The petition for review is denied.

George, C.J., was absent and did not participate.

SUPREME COURT
FILED

APR 1 8 2007

Frederick K. Ohlrich Clerk

Deputy

**MORENO**

Acting Chief Justice

**ORIGINAL**

◆JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Jesus Valencia

## DEFENDANTS

Anthony Hedgpeth

**MHP** **(PR)**

**(b)** County of Residence of First Listed Plaintiff    Kern
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Kern
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Pro Per, V-94440, Kern Valley State Prison
P.O. Box 5103, Delano, CA 93216

Attorneys (If Known)

Attorney General's Office, 455 Golden Gate Ave., Ste. 11,000
San Francisco, CA 94102

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | 26 USC 7609 | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☒ 530 General | | | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 2254

Brief description of cause:
Habeas Corpus Petition by State Prisoner

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE                    DOCKET NUMBER

DATE                    SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE