1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

9    JESUS VALENCIA,

10            Petitioner,

11      v.

12    ANTHONY HEDGPETH, Warden,

13            Respondent.

14    _____/

No. C 08-01144 MHP

**MEMORANDUM & ORDER**

**Re: Petitioner's Request for Oral Argument
and Petition for Writ of Habeas Corpus**

15        Petitioner Jesus Valencia ("Valencia" or "petitioner"), who was tried in the Superior Court

16    for the County of Santa Clara and is currently a prisoner in Kern Valley State Prison, is serving a

17    thirty-year prison sentence after being found guilty by a jury of two counts of continuous sexual

18    abuse of a child and two counts of forcible lewd conduct on a child.  Petitioner filed a timely petition

19    for writ of habeas corpus pursuant to 28 U.S.C. section 2254, alleging violation of his Sixth and

20    Fourteenth Amendment rights to effective assistance of counsel.  Petitioner contends that he was

21    denied effective assistance of counsel when his defense counsel failed to move for the suppression of

22    or object to the admission of various pieces of evidence admitted at trial, including (1) his

23    confession to police, (2) evidence related to a "red stain" on his sister's clothing after she left

24    petitioner's bed room, and (3) statements by his sister that he had previously used drugs and fought

25    with the police.  Having considered the parties' arguments and submissions, the court enters the

26    following memorandum and order.

27
28

United States District Court
For the Northern District of California

BACKGROUND

I.      Factual Background[1]

At trial, the jury heard and saw evidence of the following.  In 2000, petitioner came from Mexico to live with his mother and his younger sisters, L., K. and D. in San Jose, California.  Resp't Exh. 1 (Clerk's Transcript ("CT")) 671.  In the fall of 2003, fourteen-year-old L. told David and Rosalie Correa, workers at her school, that she had seen petitioner kissing K. on the mouth.  In January 2004, L. told Rosalie that petitioner had pulled off her blouse while they were "horse playing."  In February 2004, L. told David Correa that her brother had touched her in a bad way.  L. then told Rosalie Correa that her brother had crawled into bed with her the previous week, but nothing had happened.  Rosalie then filed a report with Child Protective Services ("CPS").

In March 2004, L. told another worker at her school, Victoria Sandoval, that petitioner had tried to get in bed with her.  Sandoval also reported this to CPS.  On July 15, 2004, L., D. and K. met Sandoval at a Walgreen's store, and K. told Sandoval that petitioner had stuck his hand in her underpants and had touched K. and D.  CT 645.  Sandoval then took the girls to her home and tried unsuccessfully to contact CPS.

On the evening of July 15, 2004, detectives interviewed each of the sisters twice.  *See generally* CT 438-524. 529-650. 843-89.  The youngest sister, eight-year-old D., told the police that petitioner had kissed her on the lips. *Id.* at 443; 448-50.  In two interviews, D. stated that petitioner pulled her and K.'s pants part of the way down, tried to remove her underpants and tried to put his hand on her private parts when she was in his bedroom to look at his pet fishes. *Id.* at 862-71, 456-62.  D. stated that petitioner touched her "two times only." *Id.* at 462.  She also stated that she did not tell her mom because her mom was sick and would get mad. *Id.* at 452-53.

K. stated that petitioner touched her four or five times. *Id.* at 468.  Petitioner tried to pull her shirt off a few times, and one time, he pulled it all the way off and touched her chest, but she was wearing another shirt underneath. *Id.* at 470-73.  Petitioner also tried to pull her pants off. *Id.* at 473.  She also saw petitioner try to remove D.'s clothes in her mother's bedroom. *Id.* at 477.  In

United States District Court

For the Northern District of California

2

**United States District Court**

For the Northern District of California

1  another incident, petitioner told K. that if she wanted to see his new fish, she had to take her clothes

2  off. *Id.* at 484.

3      K. also stated that she saw L. sleep in petitioner's bedroom one night. *Id.* at 487.  K. said

4  that when L. left his room, she had a shirt that was "all red" and had "red pants." *Id.* at 490.  When

5  the police asked why her clothes were red, K. said, "I don't know, I think it was for the pants that

6  she put something and then she was like, sleeping in her pants, I think." *Id.*  When the police asked

7  whether something had spilled, she said, "I think, I don't know, I'm not sure." *Id.*  When asked

8  whether her shirt was stained, K. responded "yes." *Id.*

9      In another interview, K. again reported to the police that petitioner put his hand under her

10  shirt on her breasts. *Id.* at 559-60.  K. also stated that while they were in her mother's room,

11  petitioner tried to pull her pants off, and she hit him with a wooden "thing" on his head, pulled her

12  pants back and got away. *Id.* at 564.  She stated that she was scared that he would touch her in her

13  privates. *Id.* at 568.  On one hot day, K. said that she and D. were sleeping in her parents' room, and

14  petitioner touched her and her sister's vaginas. *Id.* at 572.  They woke up, removed his hands and

15  took a shower. *Id.* at 578.

16      In another interview, L. stated that petitioner tried to kiss D., and that he touched K. and D.'s

17  vaginas. *Id.* at 498.  She stated that on one occasion, petitioner took her keys, and they began

18  fighting and hitting each other. *Id.* at 505-06.  While they were fighting, she started choking and

19  hitting him, and he touched her vagina and undid her bra, lifted her shirt and laughed at her. *Id.* at

20  506-08.  L. then told the police that one night, she drank six beers, petitioner told her to stay in his

21  bed, and she spent the night in his bed with him, but he did not touch her. *Id.* at 512.  L. stated that

22  D. and K. told her that petitioner had touched them under their pants, when he called them into his

23  room to show them his fishes. *Id.* at 642-43.  L. said that she told her mom about petitioner and she

24  just started crying. *Id.* at 516.  Her mother also put cameras in the house because they felt that

25  petitioner was doing "drugs and stuff." *Id.*

26      In another interview, L. reiterated the same stories as in her first interview.  She also stated

27  that on another occasion, petitioner looked at her through the window while she was taking a

28

United States District Court

For the Northern District of California

1    shower. *Id.* at 631.  L. described that petitioner would get really angry and has fought with the

2    police before. *Id.* at 597.  After the girls were interviewed by police, they were removed from their

3    home into protective custody and placed in a shelter.

4           On July 16, 2004, petitioner, who was 20 years old and had no criminal history, voluntarily

5    went to the police station to talk to the police. *Id.* at 543.  Petitioner was told that he was not under

6    arrest and that he was free to leave at any time. *Id.* at 654.  Petitioner stated that he was willing to

7    talk to "clean up this thing." *Id.* at 654.  Detectives Dillon and Tovar then conducted the interview.

8    *Id.* at 656.

9           Petitioner described that he got along with his sibling, L., but sometimes they had fights

10   when they hit each other or called each other names. *Id.* at 670-81.  Petitioner described that on one

11   occasion, he took L.'s keys and they started wrestling, L.'s shirt lifted up and he saw part of her bra

12   or breast. *Id.* at 712-729.  He stated that he might have touched L., but if he did, it was by accident,

13   and that he did not unsnap her bra. *Id.* at 781, 790.  Petitioner also stated that he never pulled down

14   K. or D.'s pants. *Id.* at 764.

15          Later in the interview, petitioner admitted that about four-and-a-half years prior, he once

16   touched K. on her vagina over her clothes, saying "Where are the little testicles?" and that about four

17   years prior, he also touched her vagina when he was watching T.V. and she was sleeping next to him

18   in her underwear. *Id.* at 815, 821.  Then, petitioner stated that about one year prior, he touched K.

19   under her panties for about three or four minutes while he was watching television and she was

20   sleeping. *Id.* at 831.  Detective Tovar stated at trial that petitioner's admission of skin-to-skin

21   contact occurred about two hours and twenty minutes into the interview.

22         After the interview, petitioner wrote letters of apology to K. and L.  In his letter to K.,

23   petitioner asked her "to excuse me for touching your intimate or private parts."  In his letter to L., he

24   asked her to excuse him "if some day I touched your intimate (private) parts" and that he was "sorry

25   for the day I pulled your blouse when I was playing with you."

26         After some time, the girls returned home to their mother.  On July 17, 2004, social worker

27   Sylvia Roque interviewed the three sisters and their mother.  The girls told her the same stories that

28

they told the police.  In August 2004, L. told Rosalie Correa that petitioner had touched her sisters and had touched D. since she was four years old.  L. stated that she would be in trouble if she told the truth and that her mother told her to deny that these things happened, otherwise they would go back to a foster home.

On September 21, 2004, D. told Gabriella Nielsen, her therapist, that petitioner touched and caressed her "private parts," and the therapist made a CPS report on that day.  CT 465-68.  D. also told the therapist that her mother told her to say that it didn't happen.  D. also said that petitioner had touched her vaginal area with his penis and put his penis in K.'s mouth when they were under a fig tree in the backyard.

In September 2004, L. told Sandoval that she was going to have to lie to the police because her mother was pressuring her to lie.  L. also said that her mother was afraid that petitioner would go to jail and be hurt and that the children would be taken away.  L.'s mother also said that she would kill herself and petitioner if the molestation allegations were true.  In October, L. asked Sandoval to tell people that Sandoval was lying.

During the trial, each of the sisters denied that petitioner ever touched them inappropriately.  D. and K. denied that petitioner ever touched their breasts or vaginas or pulled down their pants, and if he had, it was by accident.  L. testified that petitioner had never touched her breasts or vagina and that she never had seen him touch D. or K.  D. said that she had changed her story to help petitioner.  K. said that she lied to the police because she was "mad" at petitioner for throwing away some of her toys and was sad that he had moved away.  Petitioner testified that he made false admissions to the police because he thought this would bring the girls back home.

Petitioner's older sister, N., testified at trial that there had been times where petitioner and she were "play fighting" and he had touched her crotch area accidentally.  N. also stated that she had made a false accusation against her father for molesting her because she felt that he was not responsible and told L. that the accusation was false.  N. testified that L. was mad at petitioner because he got special treatment from their mother and wanted him to move out of the house.

1   Petitioner's mother also testified at trial that she did not tell any of her children to lie and that she

2   did not install hidden cameras in the house.

3   II.   Procedural History

4        Petitioner was represented by retained counsel in a jury trial in February 2005, which

5   resulted in a mistrial on all counts.  The charges were then amended to contain eight counts of lewd

6   conduct, two counts of forcible lewd conduct and two counts of continuous sexual abuse.  Defendant

7   was retried in May 2005, in Santa Clara County Superior Court (Case No. CC460324).

8        The jury found petitioner guilty on two counts of continuous sexual abuse of a child (Cal.

9   Pen. Code, § 288.5) and two counts of forcible lewd conduct on a child (Cal. Pen. Code, §

10  288(b)(1)) for acts against his three younger sisters.  CT 1022-49.  Petitioner is currently in custody

11  at the Kern Valley State Prison in Delano, California.  Petitioner was sentenced to an aggregate term

12  of thirty years in state prison.  *Id.* at 1086-88.

13       Petitioner filed a timely notice of appeal as well as a habeas petition.  All of his claims on

14  appeal and in his habeas petition related to whether his trial attorney provided effective assistance of

15  counsel.  The California Court of Appeal, in the published portion of its opinion, reversed one of the

16  continuous sexual abuse counts, holding that petitioner's right to effective assistance of counsel had

17  in fact been violated by his attorney's failure to object to the admission of prejudicial hearsay

18  testimony.  The court remanded the case for potential retrial on that count.  *People v. Valencia*, 146

19  Cal. App. 4th 92, 105 (2006).  In the unpublished portion of the opinion, the court rejected the

20  remainder of petitioner's ineffective assistance of counsel claims.  ; Resp't Exh. 6 (Ct. App. Op.) at

21  11-25.  Petitioner filed a petition for review and a petition for writ of habeas corpus in the California

22  Supreme Court, which were both denied on April 18, 2007.  Resp't Exhs. 7-10.  On February 27,

23  2008, petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. section 2254,

24  asserting the ineffectiveness claims that the Court of Appeal had previously rejected.

25

26

27

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. section 2254. 28 U.S.C. § 1331. A petition for a writ of habeas corpus made by a person in custody under the judgment and sentence of a state court of a state which contains two or more federal judicial districts may be filed in either the district of confinement or the district of conviction. See 28 U.S.C. § 2241(d). Each of such districts shall have concurrent jurisdiction to entertain the petition. See id. Federal courts in California traditionally have chosen to hear petitions challenging a conviction or sentence in the district of conviction. See Dannenberg v. Ingle, 831 F. Supp. 767, 768 (N.D. Cal. 1993); Laue v. Nelson, 279 F. Supp. 265, 266 (N.D. Cal. 1968). Since petitioner was convicted in the Superior Court for the County of Santa Clara, which is in this judicial district, the petition is properly venued in this court.

EXHAUSTION

Prisoners in state custody who wish to challenge collaterally, in federal habeas proceedings, either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). The parties do not contest that all the claims at issue in petitioner's habeas petition have been exhausted.

STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the analysis of habeas corpus claims raised by an individual previously convicted in state court. 28 U.S.C. § 2254. Under AEDPA, the court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under section 2254(d)(1), the petition may not be granted with respect to any claim that was adjudicated on

7

the merits in state court unless the state court decision (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) (interpreting 28 U.S.C. § 2254(d)(1)).

A state court decision is "contrary" to clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from our precedent." *Id.* at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be an objectively unreasonable application of established federal law, rather than simply incorrect or erroneous. *Id.* The only source of clearly established federal law under 28 U.S.C. section 2254(d) is the holdings of the United States Supreme Court as of the time of the state court decision. *See Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003) (citing *Williams*, 529 U.S. at 412).

In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the "last reasoned decision" of the highest state court that addressed the merits of the petitioner's claim. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). Here, the last reasoned decision was the decision of the California Court of Appeal.

DISCUSSION

As is discussed below, petitioner asserts that he was deprived of his Sixth and Fourteenth Amendment rights to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668,

8

United States District Court

For the Northern District of California

686 (1984).  To prevail on an ineffective assistance of counsel claim, a petitioner must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) that counsel's deficient performance resulted in prejudice, i.e. there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different.  *Id.* at 687-88, 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* 694.  The relevant inquiry under *Strickland* does not focus on what the defense counsel could have done, but whether his choices were reasonable.  *Strickland*, 466 U.S. at 688.  Consequently, "judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  Failure to satisfy either the performance or prejudice prong defeats an ineffectiveness claim.  *Strickland*, 466 U.S. at 700.

Petitioner's moving papers betray a fundamental misunderstanding of the standard of review that cabins this court's review of state court criminal proceedings.  Rather than arguing that the Court of Appeal's determination that petitioner received effective assistance of counsel is contrary to, or an unreasonable application of, clearly established federal law, petitioner briefed this case as if this court could conduct a de novo review of petitioner's trial proceedings *and* as if Ninth Circuit decisions can set forth clearly established federal law.  As is discussed above, under AEDPA, the court's review is limited and constrained.

Viewing petitioner's arguments through the proper lens, all of petitioner's ineffective assistance of counsel claims are predicated on a similar, albeit somewhat unwieldy, legal theory: that the Court of Appeal unreasonably held that, even though petitioner's attorney failed to move for the exclusion of certain evidence at trial, petitioner's constitutional right to effective assistance of counsel was not violated.  Firstly, petitioner asserts that the Court of Appeal unreasonably concluded that—even though  petitioner's counsel failed to move to suppress petitioner's confession to the police—petitioner's attorney did not perform deficiently.  Petitioner insists that his confession was coerced and therefore inadmissible.  Because the confession was involuntary, petitioner contends that his attorney performed below an objectively reasonable standard in failing to move to exclude

United States District Court

For the Northern District of California

1    the confession.  Secondly, petitioner argues that the Court of Appeal unreasonably held

2    that—assuming petitioner's attorney unreasonably failed to move to exclude evidence, testimony

3    and argument tending to establish that K. saw L. leave petitioner's room with a "red stain" on her

4    clothes—petitioner suffered no prejudice from the evidence's admission.  Finally, petitioner

5    contends that the Court of Appeal unreasonably held that—assuming petitioner's attorney acted

6    unreasonably when he failed to move to exclude the tape recording of the interview in which L.

7    stated that petitioner did drugs and had fought with the police—petitioner suffered no prejudice from

8    the evidence's admission.  The court addresses each argument in turn.[2]

9    I.    Counsel's Failure to Move to Exclude Petitioner's Confession

10           Petitioner contends that the Court of Appeal unreasonably concluded that his attorney did not

11   perform deficiently in failing to seek suppression of petitioner's confession.  In a line of decisions

12   beginning with *Brown v. State of Mississippi*, 297 U.S. 278 (1936), the Supreme Court has held that

13   a defendant's Fourteenth Amendment rights are violated when an involuntary confession is obtained

14   and introduced into evidence in a criminal prosecution, resulting in a conviction.  A confession is

15   involuntary when the defendant's "will was overborne."  *Schneckloth v. Bustamonte*, 412 U.S. 218,

16   225-26 (1973).  More specifically, the test for voluntariness is whether the confession was

17   "'extracted by any sort of threats or violence, (or) obtained by any direct or implied promises,

18   however slight, (or) by the exertion of any improper influence.'"  *Hutto v. Ross*, 429 U.S. 28, 30

19   (1976) *(*quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).  In applying this test, the court

20   must assess "the totality of all the surrounding circumstances—both the characteristics of the

21   accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 226.

22           Petitioner asserts that the police coerced him into confessing in three separate ways: (1) by

23   promising to reunify his family if petitioner confessed; (2) by promising that his sisters would not

24   have to testify in court if petitioner confessed; and (3) by promising "help" to petitioner if he

25   confessed.  The Court of Appeal found that the totality of the circumstances did not support

26   petitioner's claim that his confession was coerced.  The court therefore held that his trial counsel

27   was not deficient in failing to seek the exclusion of those statements.

28

In this court, petitioner has not argued, nor could he, that the Court of Appeal decision was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." *Williams*, 529 U.S. at 405-06. The Court of Appeal accurately set forth the legal framework for analyzing a claim of ineffective assistance of counsel[3] and discussed at great length the standard for determining when a confession is coerced[4]. Furthermore, petitioner has not identified and the court has not discovered any Supreme Court cases with a "set of facts that are materially indistinguishable" from the case at bar. As a result, petitioner is limited to arguing that the Court of Appeal unreasonably applied clearly established federal law relating to coerced confessions.

A.    The Court of Appeal Opinion

The Court of Appeal focused first on petitioner's claim that the detectives' statements about the reunification of his family were coercive. During the interview, Detectives Dillon and Tovar repeatedly told petitioner that telling the truth would help bring his family back together. Among other similar statements, Tovar stated, "I wanna know the truth about what happened. The truth is the only thing that's gonna fix all this, and keep your family together as a unit. That's the only thing that's gonna keep your family together . . . ." CT 780.[5] The Court of Appeal held that statements related to the reunification of petitioner's family addressed only what could be expected to naturally follow from the circumstances, and therefore were not equivalent to the promises of leniency or threats required for a finding of coercion. The court explained:

> Nothing that Dillon or Tovar said about the potential for reunification of defendant's family went beyond what could be expected to naturally follow from the circumstances. With defendant's younger sisters alleging that they had been sexually molested by him, his sisters obviously could not be permitted to return to the household they shared with defendant until the truth of their allegations was resolved. Early on, they told defendant that his sisters would not be returning to the family home until the "truth" was known. There was no impropriety in this statement because it merely noted the natural consequences of the allegations.
>
> By the time the subject of reunification of defendant's family came up again, defendant had already admitted touching L. Dillon and Tovar did not improperly coerce a statement by urging defendant to tell the truth in order to facilitate the reunification of his family, since this was something that would naturally spring from truthful disclosures.

United States District Court

For the Northern District of California

. . . .

> Dillon and Tovar never suggested, and defendant could not have reasonably believed, that *he* would be permitted to rejoin his family if only he admitted molesting his sisters.  Since the allegations by his sisters were the basis for the separation of his family, Dillon and Tovar were not precluded from truthfully representing that family reunification depended on the resolution of these allegations.  Nor were such representations likely to produce an unreliable and involuntary statement.

Ct. App. Op. at 19-20.

The Court of Appeal also considered and rejected petitioner's claim that the officers' suggestions that petitioner would prefer to "tell [them] what happened . . . rather [than] go to court and . . . listen to your sisters tell the judge," and other similar statements[6] were coercive.  CT 785; Ct. App. Op. at 19-20.  Specifically, the court held that Dillon and Tovar were neither offering petitioner leniency (or any other benefit) nor threatening him by suggesting that he could avoid having his sisters testify in court if he confessed:

> When Dillon and Tovar suggested that defendant would prefer to "tell us here what happened . . . rather [than] go to court and . . . listen to your sisters tell the judge" in front of other people, defendant acknowledged that he did not wish to go to court and would "feel bad" if that occurred, but he maintained that he was telling the truth and had not touched D. or K.  Again, Dillon and Tovar did not offer defendant leniency or threaten him by suggesting that he could avoid having his sisters testify in court by confessing.  Defendant could have admitted that allegations and pleaded guilty, and his sisters would then have avoided testifying in court about his molestations of them.
>
> . . . .
>
> The statements by Dillon and Tovar regarding going to court did not suggest that defendant was being offered *leniency* of any kind in return for his statements.  The necessity of his sisters being required to testify in court could have been avoided had he admitted their allegations *and pleaded guilty* to charges based on those allegations.  While defendant did end up having to go to court because he continued to deny touching D. and disavowed his admissions, the statements by Dillon and Tovar were not thereby rendered false.

Ct. App. Op. at 20 (emphasis in original).

Finally, the Court of Appeal found that the detectives' statements about wanting to "help" petitioner were not coercive.  *Id*. at 19-20.  Among other statements[7], Detectives Dillon and Tovar told petitioner: "We're trying to help you; we're not trying to, to get you in trouble . . . ."  CT 799.  The court determined that

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

> [w]hen Dillon and Tovar told defendant that they wanted to "help" him rather than "get him in trouble" . . . they made no promises or threats but simply utilized a permissible ruse in order to make defendant feel more comfortable admitting his guilt. . . . [T]he expression of frustration that Dillon and Tovar conveyed to defendant when he maintained his denial was neither a promise or a threat. Their statement that they would "just write up what they said and take it over to the D.A. and let them, let them deal with it in court" and that they "can't help you any more" was another statement of fact. If defendant continued to deny the allegations, the matter would proceed through the judicial system.

Ct. App. Op. at 19-20.

## B.  Analysis of Court of Appeal Decision

None of the Court of Appeal's determinations, taken individually or collectively, were "objectively unreasonable." *See Williams*, 529 U.S. at 409.  It was reasonable for the court to conclude that the detectives' statements regarding the reunification of petitioner's family were neither threats nor promises amounting to coercion under the *Hutto* standard, but were simply recitations of the consequences that naturally flow from the sisters' allegations and petitioner's decision whether or not to confess.  Petitioner's sisters had been placed in a shelter, and could not be returned to their home—where petitioner, who was not yet under arrest, still resided—until the detectives had determined the truth or falsity of their statements.  Similarly, with respect to the statements addressing whether petitioner's sisters would have to testify in open court, the Court of Appeal reasonably concluded that the officers were merely explaining, albeit in a manner designed to appeal to petitioner's care for his family, that the need for his sisters to testify could be one of the natural consequences of petitioner insisting that he had never engaged in inappropriate conduct.  Finally, with respect to the detectives' statements about "helping" petitioner, the Court of Appeal reasonably determined that the officers never, in fact, promised petitioner anything.  Rather, the "help" that they offered to petitioner was a chance to confess and clear his conscience, rather than listen to his sisters' testimony before a court of law as would be required if he continued to deny the allegations.  *See* CT 799, 803, 808.  Because a confession would be tantamount to pleading guilty, the detectives were not alluding to an option which was not already within petitioner's range of choices.

United States District Court

For the Northern District of California

1    The Court of Appeal's findings are reinforced by the "totality of all the surrounding

2    circumstances." *See Schneckloth*, 412 U.S. at 226. Nothing about the circumstances of petitioner's

3    discussion with the police was coercive. Petitioner came to the police station on his own accord; he

4    was not under arrest and the detectives frequently reiterated that he was free to leave at any time.

5    *See* CT 654, 656, 657. On occasions too numerous to count, the detectives simply told petitioner to

6    tell them the "truth"; never did the officers exhort petitioner to "confess." *See* CT 809 (Tovar:

7    "[W]e're not going to make you say things that aren't true . . . ."); *id.* 812 (Tovar: "Nobody's gonna

8    twist your arm and make you say anything, but I'm telling, I'm telling you from my experience,

9    gettin' it off your chest, you're gonna feel a lot better, okay? Talk, tellin' us what happened is gonna

10   make you feel a lot better, alright? But it's gotta be the truth, alright? I don't wanna hear, 'Okay, I

11   did it,' just to make us happy, to make us go away."). Moreover, although youth and ignorance are

12   factors to be considered in determining whether a statement was coerced, *see Schneckloth*, 412 U.S.

13   at 226, petitioner was a mentally competent adult, and the court finds no indication in the record that

14   he did not understand the conversation he was having with the police or the options presently before

15   him. Consequently, the appellate court's determination that the detectives' statements regarding the

16   return of petitioner's sisters did not amount to coercion was a reasonable application of established

17   Supreme Court law regarding coercion.

18   Petitioner's arguments to the contrary, to the extent that he makes them, are not persuasive.

19   The only relevant Supreme Court opinion to which petitioner cites, *Brady v. United States,* 397 U.S.

20   742, 754 (1970)*,* supports the reasonableness of the Court of Appeal's decision. In *Brady*, the Court

21   found that even "a mild promise of leniency" rendered a statement involuntary when the defendant

22   was "in custody, alone and unrepresented by counsel." *Id.* The court went on to hold that because

23   Brady did not find himself in such circumstances, his confession was voluntary. *Id.* Here,

24   petitioner, like Brady, was not "in custody." In fact, as noted above, petitioner had full freedom to

25   leave the interview at any time. *See* CT 654, 656, 657. In such circumstances, petitioner was much

26   less "sensitive to inducement," as compared with an individual who is held under arrest without

27

28

counsel. *See id.* It therefore cannot be said that the appellate court's decision was an objectively unreasonable application of *Brady*.

The remainder of the cases cited by petitioner are circuit court or state court opinions, which only serve as persuasive authority when adjudicating a habeas petition under AEDPA. See *Clark*, 331 F.3d at 1069 ("While circuit law may be 'persuasive authority' for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied."). (citations omitted). Even if the court were bound by the circuit opinions cited by petitioner, none of the cases would compel a different result. In the most persuasive case, *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), the court held that police officers' statements to a defendant, not in custody, that she would not see her child for a long time if she failed to cooperate were coercive when read together with both their threats of a lengthy prison term and promises of leniency (conveying her cooperation to the prosecutor). In the instant case, the detectives made no concurrent threats regarding prison sentences nor did they extend any promises of leniency; in addition, the statements regarding petitioner's family were directly relevant to the investigation at issue, whereas Tingle's child was irrelevant to her potential culpability in a bank robbery. Petitioner also cites to *Moore v. Czreniak*, 534 F.3d 1128 (9th Cir. 2008), where the Ninth Circuit found that the police officers' statements to the defendant that they would "go to bat" for him and that the prosecutor would not "jam" him if he confessed were coercive. There, however, the statements at issue were made when the defendant was under arrest and had been repeatedly denied counsel, whereas in the instant case, petitioner was free to leave the interrogation at any time. Moreover, in *Moore* the officers made explicit promises of leniency, whereas the detectives speaking with petitioner simply offered him an opportunity to confess and potentially resolve the matter outside of a courtroom.

The Court of Appeal's determination that the detectives' various statements were not coercive was neither contrary to, nor an unreasonable application of, clearly established federal law as announced by the Supreme Court. Therefore, by failing to move to suppress petitioner's confession,

United States District Court

For the Northern District of California

petitioner's attorney could not possibly have performed deficiently.  Because petitioner has not met his burden under *Strickland* of demonstrating that his attorney's performance fell below an objective standard of reasonableness under prevailing professional norms, petitioner's claims to habeas relief predicated upon his attorney's failure to move to exclude petitioner's confession are DENIED.

II.    Counsel's Failure to Object to Evidence About Red Stains on L.'s Clothing, or to Request California Jury Instructions Nos. 2.50.1 and 2.50.2

Petitioner also contends that the Court of Appeal's determination—that counsel was not ineffective for failing to object to the admission of evidence that K. saw L. leave petitioner's room with a "red stain" on her clothes, or alternatively, for failing to request California Jury Instructions ("CALJIC") Nos. 2.50.1 and 2.50.2 at the trial—was an unreasonable application of clearly established federal law.

At trial, the prosecutor played a recording of K.'s pre-trial statements that she saw L. leave petitioner's room after sleeping there with stained clothing.  In the recording, K. states that L.'s "shirt . . . it was uh, all red.  And she had a red pants, I think ummm, she had, I don't know, but it was all ho– , red over here, her shirt that she had right now.  It was all red like –"  CT 490.  When asked on the recording, "Red who, red from what," K.  said "I don't know, I think it was for the pants that she put something, and then she was like sleeping in her pants, I think."  *Id.*  At trial, the prosecutor also asked K. to recount her testimony in court:

> Q:    Now, did you also tell that officer that one time you saw L. coming out of Jesus's room in the morning?
>
> A:    Yeah.
>
> Q:    And you saw a red stain on part of her shirt?
>
> A:    Yeah.
>
> Q:    Was that true?
>
> A:    No.

Resp't Exh. 2 (Reporter's Transcript ("RT")) 96-97.

In his closing argument, the prosecutor then made the following statements to the jury:

> There's no suggestion from [L.] or from [K.] that [K.] is well versed in the ways of what might have happen to a girl when she's sexually penetrated for the first time

16

**United States District Court**

For the Northern District of California

or for that matter, she has intercourse when she's on her period.  [K.] is 9 years old.  We don't have proof that there was intercourse on that day, that's why we haven't charged it, but I submit to you, ladies and gentlemen, there's enough evidence out there to lead you to believe that a whole lot more is going on here, a whole lot more.

*Id.* at 1022.  The prosecutor also stated, "[K.] mentioned seeing blood on the shirt and the shorts.  That's not something the kid is going to make up, a nine-year-old, because she doesn't see it as anything significant."  *Id.* at 1071.

For the purpose of analyzing petitioner's claims, the Court of Appeal assumed that petitioner's counsel performed deficiently, and held that, under *Strickland*, petitioner was not prejudiced by the admission of the "red stain" evidence or the prosecutor's statements in his closing argument.  To begin with, the appellate court found that the admitted statements were too vague to carry significant weight in the jury's deliberation:

K.'s statements were very difficult to parse.  The only clear thing K. said was that she had seen a red stain on L's shirt after L. spent the entire night in defendant's bedroom.  K. did not say that L's pants were stained but only that L. "had a red pants . . . ."  It is entirely unclear what this meant.  Nor is it possible to make any sense out of K.'s response to the "red from what" question.  K. said "I think it was for the pants that she put something, and then she was like sleeping in her pants, I think."  Since K.'s statement in this regard was brief and substantially unintelligible, it would have had little potential for prejudice had the prosecutor not highlighted it in his argument to the jury.

Ct. App. Op. at 23.

The court then concluded that while it had "little doubt that the prosecutor's argument was intended to be inflammatory.  Yet . . . it is improbable that rational jurors would have allowed their decisions on the charged offenses, which do not include any allegations of intercourse, to be influenced by this unsupported argument."  *Id.*  Specifically, the court found that the potential for prejudice flowing from the admission of this evidence or the prosecutor's related statements was significantly diminished by the plethora of other more inflammatory evidence.  *Id.* at 23-24.  The court noted:

D. told her therapist that defendant had pulled down her pants and touched his penis to her private parts and that she had seen defendant put his penis in K.'s mouth.  D's accusation of attempted intercourse and oral copulation had far more potential to prejudice defendant than K's ambiguous testimony.  The red stain evidence and the prosecutor's argument based on it pales in comparison to D's accusations.  In addition, we must take into account that defendant admitted at least

17

United States District Court

For the Northern District of California

one unequivocal act of lewd conduct.  This admission rebutted his claim that he lacked any sexual intent.

*Id.* at 24.  The court therefore held that it was "confident that the jurors would not have reached different verdicts if only defendant's trial counsel had secured the exclusion of the red stain evidence that provided the seed for the prosecutor's argument."  *Id.*  As a result, the Court of Appeal concluded that petitioner had failed to demonstrate prejudice as required by *Strickland*.  *Id.*

The Court of Appeal's decision was neither contrary to nor an unreasonable application of established federal law.  The Court of Appeal applied the proper standard—*Strickland*'s prejudice test—and reasonably concluded that the jury likely would have reached the same conclusion regarding petitioner's guilt had his attorney successfully moved for the exclusion of the "red stain" evidence and the related portions of the prosecutor's closing statement.  This is not to say that a court, viewing the trial proceedings in the first instance, may not have reached a different conclusion.  There can be no doubt, that the "red stain" evidence was prejudicial in that it both functioned as circumstantial evidence that petitioner molested his sister and painted the petitioner in a less favorable light; and it would be absurd to assert that the prosecutor's suggestion that petitioner took his younger sister's virginity was not an inflammatory, irrelevant and unsubstantiated statement.  The Court of Appeal admitted as much.  The *Strickland* prejudice analysis is not, however, concerned with whether a given statement or piece of evidence, standing alone, increased the likelihood of conviction; all evidence that is probative of a defendant's guilt is "prejudicial."  Rather, *Strickland* requires that a court answer the following question: if the evidence had been excluded, is there a reasonable probability that the jury would have reached a different conclusion*?*  AEDPA further circumscribes this court's role in the collateral review process, limiting this court's review to determining whether the Court of Appeal conducted the *Strickland* analysis in a reasonable manner.  Given the voluminous evidence of guilt in petitioner's case, the Court of Appeal reasonably concluded that had the "red stain" evidence and the prosecutor's related, misguided statements been excluded, the jury still would have found petitioner guilty of the same counts.

None of petitioner's arguments persuade the court otherwise.  Petitioner contends that the appellate court's decision was unreasonable because it only considered the vague statements K.

18

United States District Court

For the Northern District of California

1    made during her pre-trial interview with police and not her testimony at trial in which she admitted

2    to telling the police that L.'s pants were red.  Petitioner argues that K's testimony at trial was far

3    more prejudicial than the vague pre-trial statements that the appellate court considered.  Petitioner is

4    mistaken.  Had the Court of Appeal considered whether K.'s testimony at trial was prejudicial, and it

5    should have, that inquiry would not have altered the result reached by the court.  Contrary to

6    petitioner's assertions, K.'s testimony, in which she explicitly admitted to lying to the police about

7    the red stain, was far *less* prejudicial than her pre-trial statements.  RT 96-97.  Any prejudice flowing

8    from K.'s statement that she told the officers she saw red stains on L.'s clothing was tempered by

9    her admission that she lied to the police.  Therefore, the court does not find the appellate court's

10   decision to be unreasonable in light of this additional evidence.

11          Petitioner also argues that the red stain evidence must be given more weight because this was

12   a close case.  He cites as evidence for this proposition the fact that  all of his sisters recanted their

13   stories at trial and that his first trial resulted in a hung jury.  As documented by the Court of Appeal,

14   the evidence of guilt in this case was overwhelming.  In addition, testimony was presented by

15   multiple witnesses that the sisters would lie at trial in order to obey their mother or keep their

16   brother from jail, minimizing the import of their recantations.  *Id.* at 6-7.  Finally, the charges against

17   petitioner on which the prior jury hung differed from the charges in petitioner's second trial; as a

18   result, the hung verdict in the first trial is not necessarily probative of the closeness in the second

19   trial.  *Id.* at 7-8.

20          Petitioner lastly argues that the defense counsel rendered deficient performance by failing to

21   request California Jury Instruction ("CALJIC") Nos. 2.50.1 and 2.50.2, which require that a jury

22   may only consider evidence of uncharged crimes or sexual offenses if it finds by a preponderance of

23   the evidence that the defendant committed such offenses.[8]  Although petitioner raised this claim

24   before the Court of Appeal, the appellate court's decision does not directly address its merits.

25   Nonetheless, the Court of Appeal's analysis regarding the admission of the "red stain" evidence

26   subsumes the jury instruction issue.  The Court of Appeal's reasonable conclusion that there was a

27   reasonable probability that the result of the proceedings would have been the same had petitioner

28

United States District Court

For the Northern District of California

1  successfully moved to exclude the "red stain" holds equally true if the jury had disregarded the

2  evidence pursuant to the CALJIC Nos. 2.50.1 and 2.50.2.

3      Accordingly, because petitioner has failed to establish that the Court of Appeal unreasonably

4  determined that, under *Strickland*, petitioner was not prejudiced by the admission of the "red stain

5  evidence," petitioner's habeas claims based upon his attorney's failure to object to the evidence is

6  DENIED.

7  III.   <u>Counsel's Failure to Object to L.'s Statement that Petitioner Did Drugs and Fought with</u>
       <u>Police</u>

8      Petitioner also asserts that the Court of Appeal unreasonably determined that his counsel's

9  failure to object to the admission of L.'s recorded statements that petitioner did drugs and had fought

10 with the police was not prejudicial.  The Court of Appeal found that even if defense counsel could

11 have achieved the exclusion of this evidence, these "extremely fleeting bits of evidence had little

12 potential for prejudice."  Ct. App. Op. at 24-25.  As such, it concluded that "[e]ven if defendant's

13 trial counsel could have obtained exclusion of this evidence by objecting to it, it had no real

14 potential to influence the jury's verdicts, so any deficiency was non-prejudicial."

15     Petitioner has failed to show that the Court of Appeal's decision was contrary to, or an

16 unreasonable application of, federal law.[9]  Simply put, given the other, properly admitted evidence

17 that spoke directly to the charges at issue, there was little or no probability that the character

18 evidence to which petitioner objects played any role in the jury's deliberations.  Accordingly, the

19 state appellate court reasonably concluded, under *Strickland*, that assuming it was error for

20 petitioner's counsel to fail to object to the character evidence, the outcome of the proceeding would

21 have been exactly the same.  Therefore, petitioner's habeas claims predicated on his attorney's

22 failure to object to the admission of the character evidence is DENIED.

23 IV.   <u>Cumulative Prejudice</u>

24     Lastly, petitioner contends that cumulative prejudice flowed from the several errors

25 committed by defense counsel.  Specifically, petitioner argues here and argued before the Court of

26 Appeal that, even if none of the above-asserted claims, standing alone, warranted reversal of

27 petitioner's conviction, if all of the evidence about which he complained had been excluded then the

28

United States District Court

For the Northern District of California

results of the proceeding would have been different.  This cumulative error argument is predicated on the assumption that the Court of Appeal unreasonably concluded that petitioner's attorney did not err in failing to seek the exclusion of petitioner's confession.  Trav. at 26 ("Had the case been properly litigated, the jury would not have heard three critical and highly negative pieces of evidence . . . ," including petitioner's confession.).  However, this court has already found the Court of Appeal's holding that petitioner's counsel was not deficient in failing to move to suppress the confession to be reasonable.  Accordingly, the only cumulative prejudice argument available to petitioner is that, taken together, the "red stain" evidence and the testimony regarding petitioner's drug use and run-ins with the police resulted in prejudice that would not have flowed from those individual pieces of evidence.  The Court of Appeals confidently concluded that the exclusion of each of those pieces of evidence could not possibly have altered the result of the trial; this court has no hesitation holding that the Court of Appeal would have arrived at the same decision had it considered the evidence cumulatively.  Accordingly, petitioner's claim for relief due to cumulative prejudice from his attorney's failure to object to evidence is DENIED

CONCLUSION

For the reasons discussed above, petitioner Jesus Valencia's petition for writ of habeas corpus is DENIED.

IT IS SO ORDERED.

Dated: August 24, 2010

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1.      All facts are taken from the state court Reporter's Transcript (RT), unless otherwise stated.  *See* Resp't Exh. 2.

2.      Pursuant to Habeas Local Rule 2254-8(a), petitioner requests oral argument to address these issues.  An oral argument is unnecessary when the factual record suffices.  *See* Habeas L.R. 2254-8(b) (oral argument granted at court's discretion).  Here, the facts presented in papers submitted by the parties and the record are sufficiently detailed to determine whether petitioner was deprived of the effective assistance of counsel and whether cumulative prejudice flowed from counsel's conduct at trial. Petitioner has not shown that there are uniquely complex legal or factual issues that are not sufficiently described in the papers or record which would require an oral argument.  Accordingly, petitioner's request for oral argument is denied.

3.  The court set forth the following standard for analyzing a claim of ineffectiveness:

> "Defendant has the burden of proving ineffective assistance of counsel.  [Citation.]  To prevail on a claim of ineffective assistance of counsel, a defendant must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice.  [Citation.]  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . . Moreover, prejudice must be affirmatively proved; the record must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  [Citation.]" (*People v. Maury* (2003) 30 cal. 4th 342, 389, internal quotation marks omitted.)

Ct. App. Op. at 10.

4.  The Court of Appeal set forth the following standard for determining whether a confession was coerced:

> It long has been held that the due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion.  [Citations.]  A statement is involuntary [citation] when, among other circumstances it was extracted by any sort of threats . . . , [or] obtained by any direct or implied promises, however slight . . . [Citations.]  Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the "totality of [the] circumstances."

> "Promises and threats traditionally have been recognized as corrosive of voluntariness." (*People v. Neal*, *supra*, 31 cal. 4th 63, 84.)  "In general, any promise made by an officer or person in authority, express or implied, of leniency or advantage to the accused, if it is a motivating cause of the confession, is sufficient to invalidate the confession and to make it involuntary and inadmissible as a matter of law.  [Citations.]  In identifying the circumstances under which this rule applies, we have made clear that investigating officers are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the accused speaks truthfully about the crime. [Citation.]  The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable"  (*People v. Ray* (1996) 13 Cal. 4th 313, 339-340, internal quotation marks omitted.)

> "In determining whether a defendant's will was overborne in a particular case, the Court

22

has assessed the totality of all the surrounding circumstances–both the characteristics of the accused and the details of the interrogation.  Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226, citations omitted.)

"A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. [Citations.] A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked." (*People v. Maury* (2003) 30 Cal.4th 342, 404.)

"The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police.  Thus, 'advice or exhortation by a police officer to an accused to "tell the truth" or that "it would be better to tell the truth" unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary.' . . . .[¶]  When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity.  On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear." (*People v. Hill* (1967) 66 Cal.2d 536, 549.)

Ct. App. Op. at 11-13.

5.  Dillon and Tovar also made the following statements related to family reunification:

Dillon:  "I can't send them back in the house unless I know the truth."  CT 688.

Dillon:  "Do you like seeing your family apart . . . ?"  *Id.* at 775.

Dillon:  "They're [your sisters] are telling the truth.  And if you want your family back together,  you're the key to the whole thing, okay?  It's on you."  *Id.*  at  776.

Tovar:  "Let's see if somebody can settle the curiosity and, and so it doesn't happen within your family, and we can get your family back, you, and you can, you can, you can end up working your family to where everybody's, everything's good again - it's a possibility."  *Id.* at 776.

Tovar:  "All we wanna do is get your family back together, but you gotta tell us.  But then we, if you don't say anything, we're not gonna make you say things that aren't true, but then we can't help you anymore."  *Id.* at 809.

6. Dillon and Tovar also made the following statements regarding the possibility of petitioner's sisters having to testify at trial.

> Dillon: "It's better, we're trying to get you to tell us here, rather than going to court, and then your sisters tell you, say this in front of strangers, the judge, other people there in court." CT 785.

> Dillon: "I know you don't wanna see your sisters get up there and say things like that, or people look at the recording of what they said that you did. That's why it's important, that's why we have you here to talk to you about it, so you can't tell us here, so that your poor sisters don't have to go through that, and you don't have to go through it either, be embarrassed about it." *Id.* at 785-86.

> Tovar: "[R]ight now, than have to go to court and have her—how would you feel having her say that in front of other people, the judge and, and, and all that, and you're there." *Id.* at 803-04.

> Tovar: "We're trying to make you tell us now, than to go over there in front of the judges and uh, strangers, and, and have your sisters tell them what you did , that you touched their front part one time." *Id.* at 808.

7. Dillon and Tovar also made the following statements regarding "helping" petitioner:

> Tovar: "Well you need to start talkin' about this, because you're limiting our options. There's not a whole lot I can do." CT 790

> Tovar: "Did you touch her right here when you're, when you're wrestling and you like that with your hand? And be honest with me—here you were already tell us, 'Yeah, I did this, I did that,' and you add to it. We're trying to help you; we're not trying to get you in trouble." *Id.* at 799.

> Tovar: "I don't know what else to tell you. Like he said, he's getting a little upset with everything, and we, we can only help you so much." Dillon: "He doesn't want help." *Id.* at 807.

> Tovar: "It's all we can do. I mean, I can't help you anymore." *Id.* at 811.

8. At the time of trial, CALCIC No. 2.50.1 provided:

> Within the meaning of the preceding instruction[s], the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed [a] [crime[s]] [or] [sexual offense[s]] other than [that] [those] for which [he] [she] is on trial.

> "You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that [a] [the] defendant committed the other [crimes[s]] [or] [sexual offense[s]].

> "If you find other crime[s] were committed by a preponderance of the evidence, you are nevertheless cautioned and reminded that before a defendant can be found guilty of any crime charged [or included crime] in this trial, the evidence as a whole must persuade you beyond a reasonable doubt that the defendant is guilty of that crime.

CALCIC No. 2.50.2 provides:

24

United States District Court

For the Northern District of California

1

2

"Preponderance of the evidence" means evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it.

3

4

5

6

7

8

9

10

9. Petitioner's citation to Tenth Circuit law is inapposite. As has been reiterated throughout this order, the court need only consider whether the state court reasonably applied federal law as established by the Supreme Court. Moreover, the case petitioner cites to, *Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002), is materially distinguishable from the case at bar. In *Fisher*, it was the *defense counsel* himself who admitted the evidence regarding defendant's drug use. 282 F.3d at 1300. In its reasoning, the court noted that defense counsel repeatedly elicited damaging testimony and evidence from his client, thus seriously calling into question his loyalty to his client: "We can discern nor conceive of a trial strategy that would justify this treatment of one's own client, which so clearly cast doubt upon the client's defense and his credibility and integrity before the jury." *Id.* at 1302. The court found that "the nature of the case made the counsel's errors prejudicial": "the trial was in essence a swearing match between Mr. Fisher and Mr. Johnson, either of whom could have committed the murder" and consequently defense counsel's repeated attempts to destroy the credibility of his own client, while bolstering that of Mr. Johnson, the primary witness against him, undermined a critical component of the defense. *Id.* at 1308. Such egregious conduct by the defense counsel distinguishes *Fisher* from case at bar.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28